## MARINE MART, Inc. *v.* L. D. PEARCE

5-5885                                    480 S.W. 2d 133

Opinion delivered May 15, 1972

*Jones, Gilbreath & Jones,* for appellant.

*Daily, West, Core & Coffman,* for appellee.

FRANK HOLT Justice. The appellee brought this action to rescind a contract of sale for a motor boat. For reversal of the decree rescinding the contract, the appellant contends that the Chancellor erred because the appellee (buyer) refused to permit the appellant (seller) to make a "conforming delivery" by making minor repairs; there was no rejection of the boat; and, further, there was an acceptance which precludes rescission.

On June 2, 1970, the appellant, a retail boat dealer, sold appellee a motor boat which was on display in appellant's showroom. However, the appellant's manager, Charles Robinson, then secured appellee's permission to deliver another boat which was stored in the warehouse. This agreement was upon the representation that the warehouse boat would be "identical" to the one on display. It appears these were the only two boats in stock of the same make and model. It was agreed that the seller would deliver the uninspected warehouse boat to Lake Tenkiller, approximately 70 miles distant, since appellee had no facilities to transport the boat. It is appellee's position that the boat which was delivered was not "identical" to the boat displayed in appellant's showroom. It is, also, appellee's contention that the condition of the boat when delivered required more than the making of minor repairs.

Appellee testified that on June 12, 1970, he went by appellant's business to ascertain if the boat had been delivered. Appellant's manager advised him that the boat had been delivered and was superficially damaged during

delivery. According to Robinson, there was a storm "coming up" at the time the boat was placed in appellee's rented stall and a strong wind caused the boat to come in contact with a barge (two large posts were protruding from this barge), resulting in the damage. Appellee went to the lake the next day and "found the boat in a terrible condition. We [appellee and wife] spent that full day cleaning the boat. The bow section under the gasoline tank was full of water. The section in the engine compartment was full of water. The seats had been walked on, they were muddy, the top had been walked on, it had muddy footprints on it. We took the top off of the boat and got it out on the dock and tried to clean it. We spent all that day; we didn't even start the engine. We went back on June 14th, which was Sunday, and spent the full day that day, and didn't even start the engine. So we spent two days just trying to clean it up."

He, also, found the following defects: "The upholstery on the operator's seat, the back of the operator's seat was cut in three places, cuts which were about half an inch long. We found that the rail which holds the rubber bumper around the boat near the bow section was damaged badly, a section eight to ten inches long. We found that the dash, above the dash was scratched badly, apparently in installing the windshield. We took a look at the stern light that they had delivered with the boat and found that it wasn't working properly. The nut which fastens it on, the threads were stripped and wouldn't hold." Appellee reported these deficiencies to Robinson the following Monday morning. Robinson agreed to make the necessary repairs the following Saturday, June 20. Appellee waited for him on that day and Robinson didn't appear. The first of the week the appellee again went to appellant's business and repeated his complaints to Robinson. At that time, he observed the boat that he had originally intended to purchase back on display in the showroom. The week before Robinson told him this particular boat had been sold; therefore, the damaged seat in the warehouse boat could not be replaced. Appellee proceeded to demonstrate to Robinson that the original showroom boat was free of the defects which existed on the warehouse boat which Robinson

had delivered. "It seemed to irritate him very badly. I had a list of things to go over with him. . . . Very obviously he was unhappy with me." Robinson again agreed to meet him the following Saturday and "we would go over these things and that he was going to make everything right."

On that day, appellee waited from 1 p.m. to 4 p.m. at which time Robinson and his mechanic arrived and "they proceeded to spread some repair material on the damages that had been done to the boat when he delivered it and we got into a discussion concerning the boat." The defects and damages were discussed as well as the oil being low in the boat. Robinson offered to replace the rub rail and provide a "slip cover" as a repair for the damaged vinyl upholstered seat. He did not offer to repair the dash. He and the mechanic applied a "jell coat" bonding material to the exterior side of the boat which was damaged.

Appellee characterized the damage as "holes" into the side of the fiber glass boat. Appellee, who had owned three boats and had 15 years experience in operating them, testified, "I knew he couldn't repair the damage that he had done to the boat in carrying it over there, because you just can't repair a fiber glass boat properly. The finish can't be restored. The conversation was rather unpleasant. I asked him to take the boat back." Robinson threatened to take legal action. "The conversation was broken off by Robinson and his party taking a walk down to the dock looking at the other boats. They came back and checked the repair material, said it wasn't hard enough to sand down as yet, and they prepared to leave the dock, and was ready to go back to Fort Smith, and I told them not to come back." This was about 5 p.m. It was appellee's testimony that they left on their own volition. Appellee further testified that Robinson never told him that if he could not repair the boat and "satisfy all my complaints and if I were dissatisfied, he would replace the boat." Appellee, also, testified that the damage to the metal rub rail was so extensive it indicated to him this damage had existed for some time because the

outside rubber band was undamaged; and, therefore, it was not a boat identical to the showroom boat.

On July 14, or about two weeks after Robinson had been at the lake attempting repairs, appellee. wrote one of the appellant's owners and outlined the defects in his boat and described the transactions which had occurred between him and Robinson. Approximately three weeks later, or on August 10, appellee received a reply to his letter, not from the addressee, but from Robinson. In that letter Robinson acknowledged the fact that damages to the outside of appellee's boat had occurred during delivery and noted that their offer to repair had met with a request "to leave it alone." The letter recited an offer by him to resolve the matter upon a request to him by appellee.

Also, on July 14, the appellee addressed a letter to the boat manufacturer about a "warranty registration" for the boat and asked confirmation of the registration, inasmuch as he was not sure that their local dealer, the appellant, had reported the sale of the boat "for purposes of warranty registration." Appellee never received a reply to this request. Appellee, also, wrote the motor manufacturer on July 14 as to appellant's failure to provide him with an Operation and Maintenance Manual, a copy of the warranty, and a copy of the free 20 hour checkup certificate. Further, the serial number on the invoice did not correspond with the number on the boat which had resulted in the improper licensing of the boat. A complaint was, also, made that the "trailer" button on the power trim indicator on the dash did not function. On July 28, the motor manufacturer replied with an explanatory letter about appellee's complaints. As to the mechanical difficulty, it was suggested that appellee bring it to the attention of his local dealer, the appellant.

On September 10, appellee again wrote a letter by certified mail to the motor manufacturer registering his complaint that the "Stern Drive Unit and the steering are not operating properly" and the dealer had admitted

in writing "that the oil was low in the stern drive unit when the boat was delivered." A copy of this letter was sent to appellant by certified mail. Return receipts were received from both the manufacturer and appellant. Neither party ever responded in any manner. As of the date of this letter, appellee had, on appellant's advice, used the boat only on three occasions for a total of five hours. Thereafter, he never used the boat again and filed this rescission action on November 12, 1970.

Robinson testified that when he delivered the boat it slipped into a barge causing a scratch about an inch long on the side of the appellee's boat. According to him, the scratch was less than an inch wide and only damaged the paint. Subsequently, appellee complained to him of several "little things" which were wrong with the boat. "I told him, well, whatever was wrong with the boat I would meet him up on the lake and take care of it and fix it for him." Appellee further told him "that a couple of the switches that didn't work, about the stern-light, some small pin holes in the cushion of the right front seat, and also about the rail." Robinson further testified to meeting appellee at the lake around 3:30 or 4:00 June 27. At that time, "I asked Mr. Pearce [appellee], let's go over each thing that is wrong with the boat and we would correct it. And so we went over the switches and the trim and the lights and the scratch in the bow well. . . . .There wasn't a thing wrong with it [the light]; it just needed to be tightened up. . . . There was some scratches on the aluminum rub rail. I don't really know how they got there but anyhow I agreed to replace them. . . .[T]here was three small pin holes about the size of a paper clip, end of a paper clip, in the seat [upholstery], and I agreed to replace the insert; that you can buy from the manufacturer, and what it is, the way these seats are put together, it is a piece of plywood cut out the shape they want it cut out, and it has foam rubber on top of it, and this cushion is just an insert that fits over the top of it. You take the old one off first, and you put it on, and just staple it on with a staple gun, which you can get from the manufacturer. . . We might have talked about the scratches on the dash, but I just don't remember about the scratches. I would have fixed them." Robinson's

testimony concerning repairing the damage to the out-
side of appellee's boat was: "Well, that was the last
thing actually we had fixed on the boat, and we mixed
up this jell-coat putty and we had sanded a little scratch
out and applied the putty to it, and it takes it three or
four hours to dry, then you come back and sand it with
600 sandpaper, then you rub it out with rubbing com-
pound, and you will never know that it has been scratch-
ed." Appellant adduced corroborating testimony from
the mechanic, as well as from a part owner who had
received appellee's written complaint.

Our Uniform Commercial Code provides that goods
delivered must conform to the sales contract. Ark. Stat.
Ann. § 85-2-106 (Add. 1961). The seller, however, has
a right to "cure" a non-conforming delivery, § 85-2-508,
and the seller has a "reasonable time" to effect corrective
measures. § 85-2-309 (1). § 85-2-508 reads:

> "(1) Where any tender or delivery by the seller is
> rejected because non-conforming and the time for
> performance has not yet expired, the seller may
> seasonably notify the buyer of his intention to cure
> any may then within the contract time make a con-
> forming delivery.
> (2) Where the buyer rejects a non-conforming tender
> which the seller had reasonable grounds to believe
> would be acceptable with or without money allowance
> the seller may if he seasonably notifies the buyer
> have a further reasonable time to substitute a con-
> forming tender."

However, the words "a further reasonable time" are in-
tended for the benefit of the buyer; and what constitutes
"a reasonable time" depends upon the attendant circum-
stances in each case. See Committee Comment to this
section, paragraph 3. With respect to what constitutes
acceptance of goods, appellant cites us to § 85-2-606 (1)
which reads:

> "(1) Acceptance of goods occurs when the buyer
> (a) after a reasonable opportunity to inspect the goods

signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity: or (b) fails to make an effective rejection (subsection (1) of Section 2-602 [ § 85-2-602]), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or (c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him."

And as to rejection of purchased goods, appellant refers us to § 85-2-602 which reads:

"(1) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notified the seller."

Appellant argues that pursuant to these provisions it had the right to make a "conforming delivery" by making repairs which were minor in nature; that appellee never rejected the boat and there was an acceptance of the boat which precluded rescission.

Appellee argues that the boat was not "identical" to the display boat; there was never an acceptance of the boat and, further, argues "even if appellee (buyer) accepted the boat, acceptance was rightfully revoked." In support of this position, appellee relies on § 85-2-608 (1) which provides:

"The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it (a) on the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or (b) without discovery of such nonconformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances."

What constitutes a non-conforming delivery, acceptance, rejection, or revocation of acceptance are questions of

fact to be determined within the framework of the facts of each particular case.

On appeal, this court will reverse a Chancellor's findings of fact only when such findings are against the preponderance of the evidence, *Hunter* v. *Dixon*, 241 Ark. 725, 410 S. W. 2d 389 (1966); and further, where the issue is predominantly one of credibility between interested parties, we uphold the Chancellor's judgment. *Dodds* v. *Dodds*, 246 Ark. 313, 438 S.W. 2d 54 (1969). In the case at bar, the testimony of interested parties was in direct conflict. The Chancellor had the opportunity and advantage to see and hear the witnesses. Upon consideration of all the attendant circumstances, we cannot say that the Chancellor erred by ordering a rescission of the sales contract.

Affirmed.