CHRYSLER CORPORATION, Plaintiff and Appellant, v. ADAMATIC, INC., Defendant: LAKESHORE COMMERCIAL FINANCE CORPORATION, First Intervenor Respondent: EISENBERG, only as receiver of Adamatic, Inc., Second Intervenor Respondent.* [Three appeals.]

*No. 336. Argued January 30, 1973.—Decided June 18, 1973.*
(Also reported in 208 N. W. 2d 97.)

* Motion for rehearing denied, with costs, on August 28, 1973.

220

222

226

228

For the appellant there were briefs by *Whyte, Hirschboeck, Minahan, Harding & Harland, S. C.,* attorneys, and *Victor M. Harding, Frederick A. Muth, Jr.,* and *Anthony W. Asmuth III* of counsel, all of Milwaukee, and oral argument by *Victor M. Harding.*

For the first intervenor-respondent Lakeshore Commercial Finance Corporation there was a brief by *Lorinczi & Weiss,* attorneys, and *Robert K. Steuer* and *Robert P. Goldstein* of counsel, all of Milwaukee, and oral argument by *Robert K. Steuer.*

For the second intervenor-respondent Russell A. Eisenberg, as receiver of Adamatic, Incorporated, there was a brief and oral argument by *Mr. Eisenberg,* pro se.

A brief amicus curiae was filed by *Polacheck & Harris,* attorneys, of Milwaukee, and *Allan Polacheck,* of Milwaukee, *Eli S. Silberfeld,* and *Silberfeld, Danziger & Bangser,* all of New York, of counsel, for the National Commercial Finance Conference, Inc.

HEFFERNAN, J. It should be emphasized that the cause of action is for replevin. The action was brought by Chrysler to gain possession of the machines and for damages against Lakeshore for their wrongful detention. Although there is evidence in the record indicating a breach of contract by the manufacturer, Adamatic, no relief is sought for that. Lakeshore, on the other hand, asserts ownership of the machines because of its prior perfected security agreement with Adamatic. The receiver, representing the general creditors, bases its claim upon Lakeshore's rights as a secured creditor, but in addition asks for an accounting by Lakeshore for any excess which Lakeshore may receive from Chrysler. As an alternative only, the receiver argues that Chrysler's taking of the goods was a voidable preference as against the unsecured creditors. No claim is asserted by either creditor against Chrysler for amounts unpaid on the contract price.

The legal issues fall into the natural division between the first contract involving the six-coil winder and the subsequent contract concerned with the three machines that are designated as twelve-coil winders.

*The first contract—six-coil winder.*

As recited in the statement of facts, the six-coil winder and the cell inserter were returned to Adamatic for alter-

ations on August 12, 1970. Chrysler asserts, in respect to the six-coil winder, that it had title and possessory rights to the machine from the time it was first delivered to the Chrysler plant in February, 1970. It asserts that the machine was returned to Adamatic on a bailment, by which Adamatic was to hold the winder for repair and alteration. Both creditors, Lakeshore and the receiver, assert that the return of the machine revested the title in Adamatic and made it subject to their claims.

Under sec. 402.401 (1), Stats., subject to the provisions of ch. 409 and other limitations not applicable here, "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." The contract between Chrysler and Adamatic explicitly agreed that title to the six-coil winder and the cell inserter would vest in Chrysler upon the completion of manufacture and shipment to the Chrysler plant. Chrysler, therefore, obtained title to this machine when it was shipped from the Adamatic plant in early February, 1970. At that time, under the terms of sec. 402.106 (1) there was a completed sale. It is undisputed that this sale was in good faith and in the ordinary course of business. There is no claim that the original sale was in violation of Lakeshore's security interest or constituted a preference against the unsecured creditors.

In accordance with the provisions of sec. 409.307 (1), Stats., Chrysler took the machines free of Lakeshore's security interest. The creditors, however, assert that Chrysler never "accepted" the goods or, if there were an initial acceptance, such acceptance was subsequently revoked. They rely upon sec. 402.401 (4) for the proposition:

"A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, or a justified revocation of acceptance revests title to the goods in

the seller. Such revesting occurs by operation of law and is not a 'sale.' "

This question was fully litigated, and the trial judge made the finding that Chrysler had title to the six-coil winder and the cell inserter at all times after their initial delivery to Chrysler. A review of the record reveals that this finding is fully supported by the applicable law and the evidence adduced at trial.

The fact that title passed when the goods were first delivered, however, does not ipso facto evince Chrysler's acceptance of them. A sale of goods does not necessarily imply the buyer's acceptance. White & Summers, *Uniform Commercial Code*, p. 249, sec. 8–2. While the delivery of the goods completed the sale, whether Chrysler accepted the machine depends on Chrysler's conduct after the delivery. Sec. 402.606, Stats., delineates conduct that constitutes the acceptance of goods. A buyer accepts goods if he notifies the seller that he accepts them, if he fails to make an effective rejection, or does an act inconsistent with the seller's ownership. There is no evidence that Chrysler expressly notified Adamatic that it was accepting the goods. On the other hand, Chrysler retained the six-coil winder for over six months without rejecting it. Under sec. 402.602, the rejection of goods must be made within a reasonable time after delivery and rejection will be ineffective unless the buyer seasonably notifies the seller.

No notification was ever given of the rejection of the six-coil winder. While there was evidence that Chrysler was displeased with the performance of the initial winder, there was no intimation that the winder was being rejected, although a letter from Chrysler to Adamatic carried the suggestion that, if the six-coil winder did not operate satisfactorily, the second contract—the contract for the three twelve-coil winders—would be cancelled. Chrysler in fact retained the six-coil winder for at least

two months following the threat to cancel the other contract.

There was also evidence that Chrysler, during the period of possession, treated the six-coil winder as its own. It tagged the machine with a brass plate, giving it a Chrysler inventory serial number. Such conduct alone has been found to be evidence of acceptance. *Julian C. Cohen Salvage Corp. v. Eastern Electric Sales Co.* (1965), 205 Pa. Super. 26, 206 Atl. 2d 331, 2 U. C. C. Rep. 432. The cell inserter was completely acceptable to Chrysler, but it, too, was returned to Adamatic. There is no contention that the mere return of the cell inserter constituted a rejection; rather, it was needed by Adamatic to run tests on other winders that were being manufactured. The documents that passed between Chrysler and Adamatic at about the time of the return of the six-coil winder and cell inserter show that Chrysler wished to retain title and possession of the machine and was returning it merely for adjustment and modification.

The questions of acceptance or rejection of goods are questions to be resolved by the finder of fact and depend upon the ascertainment of the intent of the parties. *Marine Mart v. Pearce* (1972), 252 Ark. 601, 480 S. W. 2d 133, 10 U. C. C. Rep. 1047; *Cervitor Kitchens, Inc. v. Chapman* (1972), 7 Wash. App. 520, 500 Pac. 2d 783, 11 U. C. C. Rep. 534; *Valley Die Cast Corp. v. A. C. W., Inc.* (1970), 25 Mich. App. 321, 181 N. W. 2d 303, 8 U. C. C. Rep. 488; 2 Anderson, *Uniform Commercial Code* (2d ed.), p. 242, sec. 2–608:9.

The trial judge's finding that the six-coil winder was accepted by Chrysler is not contrary to the great weight and clear preponderance of the evidence. The receiver makes the argument, however, that, because the six-coil winder and the cell inserter were shipped back to Adamatic under a bill of lading, a "document of title," the title to the machines was revested in Adamatic.

Such argument, under the facts here, is incorrect as a matter of law. The machinery was shipped from the Chrysler plant in Indiana to Adamatic in Wisconsin. The shipment was in interstate commerce, and was subject to the federal Bills of Lading Act, 49 USCA, sec. 81, *et seq.*, and not art. 7 of the Uniform Commercial Code. The document was a straight, nonnegotiable bill, governed by the provisions of 49 USCA, sec. 112. That section provides:

"A person to whom a bill has been transferred, but not negotiated, acquires thereby as against the transferor the title to the goods, subject to the terms of any agreement with the transferor. . . ."

The essential agreement betwen Chrysler and Adamatic is contained in the "Consigned Material Receipt Agreement" executed by the parties, which recites that title was to remain in Chrysler despite the shipment of the six-coil winder to Adamatic for modification.

The receiver claims, however, that title was transferred to Adamatic by virtue of a provision appearing on the reverse side of a quotation form which was sent by Adamatic to Chrysler quoting the price of converting the six-coil winder to a twelve-coil winder. That document in essence provides:

"Delivery of equipment to a carrier at point stated on quotation, consigned to the purchaser, or his order . . . shall constitute transfer of title . . . ."

This document is relevant only when goods are shipped from Adamatic to a customer. It does not purport to place title in Adamatic upon a shipment back. It is only intended to govern the passage of title when goods manufactured by Adamatic are delivered to a buyer.

The receiver also attacks the meaning to be given to the "Consigned Material Receipt Agreement," claiming that a consignment passes title, unless additional re-

quirements of the Uniform Commercial Code are complied with, and that the failure to meet these requirements will permit the consignee's creditors to obtain an interest in the goods. For this purpose, the receiver relies upon *Columbia International Corp. v. Kempler* (1970), 46 Wis. 2d 550, 175 N. W. 2d 465. That case, however, deals with consignments for sale and is wholly inapplicable to the facts under consideration here. Chrysler was not returning the machinery so that Adamatic could sell or lease it to third persons. As the term, "consignment," is used in the instant case, it refers only to the consignment of goods to a common carrier for shipment to Adamatic.

There is sufficient evidence to show that Chrysler acquired full title in the six-coil winder and cell inserter at the time of their initial delivery, and that Lakeshore's security interest could not re-attach to the goods in absence of a rejection by Chrysler. The rights acquired by Adamatic were those of a bailee, who had a possessory interest for a limited purpose, but did not amount to "rights in the collateral." Sec. 409.204 (1), Stats.; *Cain v. Country Club Delicatessen of Saybrook, Inc.* (1964), 25 Conn. Supp. 327, 203 Atl. 2d 441, 2 U. C. C. Rep. 247. *See also:* 1 Gilmore, *Security Interests in Personal Property* (1965), p. 353, sec. 11.5; 4 Anderson, *Uniform Commercial Code* (2d ed.), p. 179, sec. 9–204:7.

Under sec. 128.07, Stats., an insolvent creditor, which Adamatic was, creates a preference when he transfers his "property" to a creditor under the circumstances stated in that statute. The facts demonstrate that the property was that of Chrysler and not that of Adamatic. Accordingly, no preference resulted. *See,* 4 Collier, *Bankruptcy* (14th ed.), p. 145.

We hold that Chrysler, under the applicable law, was entitled to replevin of the six-coil winder and cell inserter. The receiver claims, however, that this was a

prejudgment replevin and, therefore, unconstitutional. It argues that, subsequent to the commencement of this action, the United States Supreme Court in *Fuentes v. Shevin* (1972), 407 U. S. 67, 92 Sup. Ct. 1983, 32 L. Ed. 2d 556, declared a prejudgment replevin statute, somewhat similar to Wisconsin's, unconstitutional as a denial of due process.

This constitutional issue was not raised on trial; and, in accordance with our well-recognized procedure, claimed errors at trial that have not been preserved by appropriate motions and objections will not be considered by this court. We have on occasion considered matters for the first time on appeal when, to fail to do so, would result in a substantial prejudice to one of the parties. We see no evidence of such prejudice here.

While we do not validate an arguably unconstitutional replevin statute, the only claim of prejudice made by the receiver on this appeal is that, because the machines were removed from this state, it was hindered in developing evidence on the issue of value.

The merits of the replevin itself have, however, been fully litigated, and we hold, as did the trial court, that the six-coil winder and the cell inserter were the property of Chrysler. Accordingly, the question of the value of the six-coil winder and cell inserter is immaterial. Since the constitutional infirmity of the statute was not timely raised and the failure to consider it in no way prejudices the present objector, we will decline to consider it on this appeal. *Thorp Credit, Inc. v. Barr* (Iowa, 1972), 200 N. W. 2d 535; *Security Pacific National Bank v. Goodman* (1972), 24 Cal. App. 3d 131, 100 Cal. Rptr. 763.

*The second contract—twelve-coil winders.*

The situation in respect to the three twelve-coil winders is markedly different from that of the six-coil

winder and the cell inserter. In respect to the twelve-coil winders, although there had been a contract entered into at an earlier time, the delivery of the goods was occasioned only by the replevin seizure itself. In the absence of Chrysler's claim, Lakeshore's right to the possession of the twelve-coil winders would be unquestioned.

It was conceded that Lakeshore had loaned substantial sums to Adamatic and, under ch. 409, Stats., had perfected a valid security interest in Adamatic's inventory. It was stipulated by the parties that, prior to the replevin, the twelve-coil winders were a part of that inventory. Had Chrysler not seized the machines under its claim of right, upon Adamatic's default Lakeshore could have taken possession of the machines under sec. 409.503 and sold them under the provisions of sec. 409.504 to satisfy, in part at least, Adamatic's obligations.

The mere physical transfer of the machines from Adamatic to Chrysler does not defeat Lakeshore's right to foreclose on the collateral. A perfected security interest gives the secured creditor rights in the goods themselves, and under the rule of sec. 409.201, Stats., those rights follow the collateral into the hands of subsequent owners.

Applying the principles of the Uniform Commercial Code, it is apparent that Chrysler took physical possession of the machines at a time when Lakeshore would ordinarily be entitled to their possession. Chrysler's possession of the goods is, therefore, subject to Lakeshore's security interest unless some other provision of the code is sufficient to supersede the rights of Lakeshore.

Chrysler relies upon sec. 409.307 (1), Stats., as an exception to the general rule that a purchaser is subject to an outstanding security interest. That section provides:

"A buyer in ordinary course of business . . . takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

Chrysler claims to be "a buyer in ordinary course of business." That term is defined by sec. 401.201 (9), Stats.:

" 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a pre-existing contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt."

Chrysler claims that it became a buyer in ordinary course of business at the time it originally contracted to purchase the twelve-coil winders. It further argues that Lakeshore's security interest was cut off at the time of entering into the contract and, at the time it took possession of the machines by replevin, its possession was free and clear of any claims of the secured creditor. Lakeshore and the receiver for the general creditors are united in disputing this claim. They argue that nothing less than a bona fide transfer of the goods could cut off the security interest, and that a replevin cannot constitute a transaction in ordinary course.

The initial question posed is whether one can become a buyer in ordinary course before a sale has occurred. While it is apparent that the contract was a contract to sell, only the position of the creditors can be reconciled with the language of the Uniform Commercial Code.

Under sec. 401.201 (9), Stats., "buying" includes receiving goods under a pre-existing contract for sale. The

statute is silent on the question of whether "buying" encompasses a situation where there has been a non-receipt of the goods; but the enumeration in the statute, when reasonably construed, limits buying in ordinary course of business to those situations where a "sale," defined by sec. 402.106 (1) as "the passing of title from the seller to the buyer for a price," has occurred. There is no contention that title passed to Chrysler prior to the physical transfer occasioned by the replevin, but, under sec. 401.201 (9), the buyer in ordinary course must buy without knowledge that the sale is in violation of the rights of a third party. In the instant case Chrysler, at the time of the replevin, had full knowledge of the perfected security interest of Lakeshore.

The commentators who have written on sec. 401.201 (9), Stats., shed but confused elucidation on whether one can become a buyer in ordinary course merely by entering into a contract to buy. Professor Gilmore notes that the Uniform Commercial Code, unlike prior uniform acts, does not require that a buyer actually take delivery to attain the status of buyer in ordinary course of business. 2 Gilmore, *Security Interests in Personal Property,* p. 696, sec. 26.6. *See also:* Warren, *Cutting Off Claims of Ownership under the Uniform Commercial Code,* 30 Univ. of Chicago L. Rev. (1963), 469, 473. Smith, in his article, *Title and the Right to Possession under the Uniform Commercial Code,* 10 Boston College Industrial and Commercial L. Rev. (1968), 39, 61, concludes, however, that one cannot be a buyer in ordinary course prior to taking delivery of the goods.

It seems clear that, if there is a sale and the buyer has obtained title to the goods, his status as a buyer in ordinary course will not be defeated merely because he has not taken possession. Such is not our situation here, where Chrysler buttresses its claim as a buyer in ordinary course by asserting that the replevin action was a part

of the process by which title passed. Moreover, in the contract between the parties, delivery was envisaged as an integral part of the title-passing process.

Although both parties have treated all three twelve-coil winders as being "identified to the contract," the state of the record reveals grave doubt that this is really the fact. Only one machine was in a deliverable state. The other two, at the most, were but incompletely assembled component parts. While the Commercial Code, as pointed out above, does not require that in all cases the buyer actually take delivery in order to have a buyer in ordinary course of business status, sound policy considerations in the instant situation would seem to dictate that the rights of a secured creditor ought not be impaired in the absence of a physical transfer or assignment of the goods. We agree generally with the position submitted by the National Commercial Finance Conference as amicus curiae. It points out that the Code generally gives preference to property interests which are evidenced either by recording or possession and that, to adopt the view of Chrysler, the financier of an inventory would no longer be able to rely on recorded interests and the status of his debtor's inventory. We recognize that this policy argument has been criticized by writers who contend that the commercial reality is that lenders rely not upon inventories or recorded instruments but rather upon the credit ratings of prospective debtors. *See,* Gordon, *The Prepaying Buyer: Second Class Citizenship under Uniform Commercial Code Article 2,* 63 Northwestern Univ. L. Rev. (1968), 565, 576; Note, *The Uniform Commercial Code and an Insolvent Seller's Possession of Goods Sold,* 104 Univ. of Pa. L. Rev. 91, 93.

This court, in *Columbia International Corp. v. Kempler, supra,* p. 559, took a different position, stressing the policy of this jurisdiction—to place major reliance upon "apparent or ostensible ownership. People should be able

to deal with a debtor upon the assumption that all property in his possession is unencumbered, unless the contrary is indicated by their own knowledge or by public records."

Thus, if Chrysler is to be afforded a status as a buyer in ordinary course of business, we conclude that such status must be determined as of the time it actually took possession of the goods.

The remedy of replevin is an unusual and drastic mode of recourse to secure the rights of a purchaser; and, from the viewpoint of common knowledge, it is almost absurd to argue that the acquisition of possession by replevin is in the ordinary course of business. It is certainly so in the instant case when we consider sec. 402.402, Stats. (the buyer's right of replevin) and sec. 402.716. Sec. 402.402 (3) (a) provides:

"Nothing in this chapter shall be deemed to impair the rights of creditors of the seller:
"(a) Under the provisions of ch. 409 . . . ."

The Commercial Code itself specifically negatives Chrysler's contention that the replevin alone can in any way affect the rights of a prior secured creditor. Even if it be argued that these three machines were identified to the contract, sec. 401.201 (37), Stats., states:

". . . The special property interest of a buyer of goods on identification of such goods to a contract for sale under s. 402.401 is not a 'security interest' . . . ."

Chrysler thus makes the anomalous and unacceptable claim that its buyer's interest gives it a right superior to the holder of an antecedent perfected security interest.

Chrysler is not a buyer in ordinary course of business and holds the machines subject to the security interest of Lakeshore. From the viewpoint of equity, this is an unsatisfactory result, for the record shows that, prior to the replevin, Chrysler had substantially paid the contract

price for all the goods involved. Our conclusion, however, is supported by the writings of distinguished commentators, who have pointed out that the Code itself affords but little protection for the prepaying buyer. The Code, however, gives broad latitude whereby a prepaying buyer, acting timely, can enter into suitable arrangements for his own protection.

In the instant case Chrysler was fully aware of the fact that it was not only a buyer but was financing the manufacturing process. It was for that reason it made progress payments on the basis of the work and materials as the manufacturing progressed. By proper negotiations with the other creditors, it might well have protected itself by obtaining a security interest in the goods it had contracted to buy. Lakeshore as a substantial creditor, interested in the well being of Adamatic, might well have been amenable to a Chrysler proposal that Lakeshore in part subordinate its security interest. In view of the size of this contract in proportion to the limited assets of the manufacturer, it was almost foolhardy for Chrysler to proceed in the face of the perfected security interest of Lakeshore.

Numerous law review articles discuss the problems posed for the prepaying buyer by the Code and various methods that may be used to obviate the very situation which resulted here. *See, e.g.,* Gordon, *The Prepaying Buyer: Second Class Citizenship under Uniform Commercial Code Article 2,* 63 Northwestern Univ. L. Rev. (1968), 565, 571; Peters, *Remedies for Breach of Contracts Relating to the Sale of Goods,* 73 Yale L. J. (1963), 199, 238, 239; Speidel, *Advance Payments in Contracts for Sale of Manufactured Goods: A Look at the Uniform Commercial Code,* 52 Cal. L. Rev. (1964), 281; Note, *Bankruptcy and Article Two of the Uniform Commercial Code: The Right to Recover the Goods upon Insolvency,* 79 Harv. L. Rev. (1966), 598, 612.

As a result of the replevin action, the machines are presently in the possession of Chrysler. The taking of the machines by Chrysler under the circumstances was unlawful. Lakeshore, not Chrysler, was entitled to possession of the twelve-coil winders. Under the rule of *Barclay Brass & Aluminum Foundry v. Resnick* (1967), 35 Wis. 2d 620, 151 N. W. 2d 648, Chrysler must either return the goods or account for their value; and under sec. 409.502 (2), Stats., Lakeshore is obligated to account to the receiver, as the successor to Adamatic, for so much of the value of the goods as exceeds Lakeshore's interest.

The jury in the instant case made the finding that the total value of the three twelve-coil winders was $220,000. The jury was properly instructed that value means:

". . . the price which a purchaser, willing but not required to buy, would pay to a seller, willing but not required to sell, for goods of the same quantity and quality of those involved in the question."

Although Chrysler objected to this instruction, in its brief it concedes that the instruction was appropriate for determining creditors' damages in the event Chrysler were found to be in wrongful possession of the goods.

We conclude, therefore, that the determination of value, made by the jury on the basis of conflicting testimony, properly found the sum which Chrysler is now obligated to pay over to Lakeshore in lieu of the return of the goods themselves. This finding was approved by the trial court and is supported by substantial evidence.

Chrysler also argues that it is entitled to damages for the few days of unlawfully withheld possession of the goods by Adamatic. Although we conclude that Chrysler was entitled to the six-coil winder and the cell inserter (and it is only these items that were unlawfully withheld), the trial judge properly concluded that Chrysler failed to prove any special damages for the unlawful detention.

While the record arguably presents other causes of action than replevin that might have been asserted by Chrysler against either Adamatic or Lakeshore, they are not a part of this suit. The measure of Chrysler's damage in the replevin action is stated in Wells, *Replevin* (2d ed.), p. 456, sec. 521:

"If the plaintiff prevails, the judgment is that the property belongs to him, that he rightfully took it by his writ, and that he is entitled to damages and costs, as well as judgment for the property. Where the property was delivered to him upon the writ, his damages only include such sum as will compensate him for the injury he has sustained by reason of the wrongful taking or subsequent detention, together with any depreciation in value it may have suffered up to the time when he obtained it by virtue of his writ, and not the value of the property."

The only evidence that Chrysler presented to show damages because of the retention of the six-coil winder and cell inserter after the demand was made by Chrysler was the testimony of a Chrysler employee that the machine could save Chrysler $200 per day. However, the machines were not in operable condition, and Chrysler would not have been able to use the machines even though Adamatic yielded up possession immediately. In *Barclay Brass, supra,* pages 627, 628, we quoted with approval from Wells, *Replevin, supra,* and stated:

" 'This rule, allowing the value of the use, is peculiar to the action of replevin. It grows out of the fact that the plaintiff asserts his continued ownership in the property, and seeks to recover the property and not its value. . . . It only applies in cases where the party claiming the use is in a situation to use it, and has a right to use it, [citing *Barney v. Douglass,* 22 Wis. 464] and only applies to cases where the property can be put to use. It is for only the loss of the use of property which the party is in a situation to use, and can use, that the value of the use is allowed.' "

Chrysler is entitled to nominal damages only. Such damages are to be computed as the interest on the value of the six-coil winder and cell inserter for the short period of time they were unlawfully detained by Adamatic. Upon the same rationale, should Lakeshore elect to be paid the value of the three twelve-coil winders, it is entitled to interest on their value from the time of Chrysler's unlawful replevin. *Barclay Brass & Aluminum Foundry v. Resnick, supra,* page 630; Cobbey, *Replevin* (2d ed.), p. 465, sec. 877.

*By the Court.*—Judgment reversed in part and affirmed in part; cause remanded for further proceedings not inconsistent with this opinion.

* Motion for rehearing denied, without costs, on August 28, 1973.