# Joseph DANIEL and Marijane Daniel, Plaintiffs-Appellants,

## v.

# BANK OF HAYWARD, Defendant-Respondent.

Supreme Court

*No. 87–1159. Argued May 31, 1988.—Decided June 30, 1988.*

(Also reported in 425 N.W.2d 416.)

For the plaintiffs-appellants there were briefs (in court of appeals) by *Joe Thrasher* and *Weisel, Thrasher, Doyle & Pelish, Ltd.,* Rice Lake and oral argument by *Joe Thrasher.*

For the defendant-respondent there was a brief (in court of appeals) by *Scott W. Clark* and *Clark and Clark,* Ashland and oral argument by *Scott W. Clark.*

Amicus curiae brief was filed by *John E. Knight, James E. Bartzen* and *Boardman, Suhr, Curry & Field,* Madison for Wisconsin Bankers Association.

SHIRLEY S. ABRAHAMSON, J. This is an appeal from a judgment of the circuit court for Sawyer county, Alvin L. Kelsey, circuit judge. The judgment dismissed Joseph and Marijane Daniel's complaint and granted summary judgment in favor of the

defendant, Bank of Hayward. We granted the petition to bypass. Sec. 808.05(1), Stats. 1985–86. We reverse the judgment of the circuit court and remand the case.

This case presents the following issue: When does a retail purchaser who makes a down payment on a motor vehicle but does not take title to the vehicle become a "buyer in ordinary course of business" under secs. 401.201(9) and 409.307(1), Stats. 1985–86, to prevail over the security interest of the motor vehicle dealer's floor plan financer?

In *Chrysler Corp. v. Adamatic*, 59 Wis. 2d 219, 208 N.W.2d 97 (1972), this court concluded that a purchaser becomes a buyer in ordinary course of business when he or she takes title to the goods. The circuit court did not refer to the *Chrysler* case but concluded that a retail purchaser who makes a down payment on a motor vehicle but has not taken title to the vehicle has not acquired a sufficient property interest in the vehicle to prevail over the secured lender. Because the purchasers in this case did not take legal title to the vehicle, the circuit court concluded that the secured creditor prevailed over the purchasers and granted summary judgment to the Bank. We conclude that the purchasers in this case became buyers in ordinary course of business when the vehicle was identified to the contract. To the extent that our decision in the *Chrysler* case is inconsistent with our decision in this case, we overrule the *Chrysler* case.

The facts in the record are undisputed. Joseph and Marijane Daniel, the purchasers, entered into a motor vehicle purchase contract in May 1983 with Don Hofstadter, Inc., a motor vehicle dealership in the City of Hayward. The purchasers agreed to purchase a 1984 Chevrolet van which had not yet been manufactured and to trade in the older motor home. According

to the contract, the cash price of the vehicle was $12,077.55; the trade-in allowance was $8,675.55; and the amount the purchasers owed on delivery was $3,402.00. The contract described the motor vehicle and its various accessories but did not set forth the vehicle identification number because the vehicle had not been manufactured when the contract was signed.

The purchasers signed over title to their existing motor home and delivered the home to the dealership. The dealership sold the motor home on or about June 6, 1983. The record does not reflect how much the dealership received on the sale of the motor home, and it is not clear whether the Bank received any of the proceeds.

The dealership did its financing, including floor plan financing on new vehicles, with defendant Bank of Hayward (Bank). The floor plan financing operated as follows: There was a master note in the original sum of $150,000 dated April 19, 1982. When the dealership would order a new vehicle from General Motors, the Bank would receive a copy of that order. Prior to GM's delivery of the new vehicle to the dealership, GM would send the Bank a sight draft which included the vehicle identification number. The Bank would then prepare an individual floor plan note in the amount of the draft and the dealership would sign it. When the individual note was signed by the dealership, the Bank would pay GM. GM would then send the Manufacturer's Statement of Origin (MSO) to the Bank which retained the MSO. Because the MSO is necessary to obtain title to the motor vehicle, the Bank effectively controlled delivery of title to the retail purchaser and ensured itself of being paid. This procedure was unusual. Ordinarily, GM would send the MSO directly to the dealership. The

Bank used the unusual procedure in this case because it was concerned about the financial status of the dealership.

On September 30, 1983, the Bank received a sight draft from General Motors for the van the purchasers had ordered. The dealership executed a floor plan note in the amount of $9,905.22 to pay General Motors for a 1984 Chevrolet van, I.D. No. 1GCGG35M6 E7105325. The parties agree that the van bearing this identification number is the vehicle the purchasers ordered. The Floor Plan Note conveyed a security interest in the van to the Bank on September 30, 1983.

Sometime on Friday, October 21, 1983, the Chevrolet van was delivered to the dealership. On Saturday, October 22, 1983, the Bank discovered that its debtor, the dealership, was removing used vehicles from the lots. Because these used vehicles were collateral for the Bank's loans, the Bank called all loans and secured the lot so that no vehicles could be removed. The purchasers' Chevrolet van was among the new vehicles on the lot when the Bank took possession of the dealership's premises.

On October 24, 1983, the purchasers went to the dealership to complete the purchase of the van. Upon learning of the Bank's security interest in the van, they negotiated the release of the van with the Bank and a representative of the dealership.

The Bank was willing to release the van only if the purchasers paid in full the Bank's interest in the van pursuant to the Floor Plan Note, namely, $9,905.22. According to their contract with the dealership, the purchasers did not owe the dealership $9,905.22. By virtue of the trade-in, the purchasers owed the dealership only $3402.00. Because the purchasers needed the van to go to Florida, they borrowed

$9,905.22 from the Bank to pay the Bank for its interest in the van, and they then took title to and possession of the van. They brought this action against the Bank to recover damages "to the extent of the over-payment together with consequential damages including interest on the monies that plaintiff had to borrow to meet the extorted demands of the bank, actual attorney's fees incurred and a great inconvenience all to their damage in the sum of $15,000."

As we stated previously, the sole question in this case is: *When* do purchasers who make a down payment under a contract for sale and have not taken title to the vehicle achieve the status of buyer in ordinary course of business? If the purchasers in this case became buyers in ordinary course of business prior to the Bank's seizing the van, their interest in the van takes priority over the Bank's perfected security interest.

We examine first the relevant provisions of the Wisconsin Uniform Commercial Code. Chapter 409 of the Wisconsin Statutes (Article 9 of the Uniform Commercial Code) (Code) establishes a priority system for determining the rights of parties who claim competing interests in secured property. As a general rule, the holder of a perfected security interest has an interest in the the secured property which is superior to the interests of the debtor, unsecured creditors of the debtor and subsequent purchasers of the secured property. Sec. 409.201 provides as follows:

"**Sec. 409.201. General validity of security agreement.** Except as otherwise provided by [this code] a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors."

Sec. 409.201 thus protects the secured creditor. The Code provides, however, exceptions to the rule that the secured creditor has priority over purchasers of the collateral. A principal exception to the rule is found in sec. 409.307(1), captioned "protection of buyers of goods," which permits a buyer in ordinary course of business as defined in sec. 401.201(9) to take free of a security interest created by the seller. The Code thus recognizes a potential conflict between the buyer in ordinary course of business and the seller's secured creditor and attempts to seek a fair accommodation between the two. Sec. 409.307(1) provides in relevant part as follows:

> "**Sec. 409.307. Protection of buyers of goods.** (1) A buyer in ordinary course of business as defined in s. 401.201(9) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his or her seller even though the security interest is perfected and even though the buyer knows of its existence."

Sec. 409.307(1) severs the inventory lender's security interest in favor of the buyer in ordinary course of business. In order to prevail over the Bank's perfected security interest, the purchasers in this case must qualify as buyers in ordinary course of business, as that term is defined in sec. 401.201(9). Sec. 401.201(9) defines buyer in ordinary course of business as follows:

> "Sec. 401.201(9) 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a 3rd party in the goods buys in ordinary course from a person in the business of selling

goods of that kind but does not include a pawn-broker .... 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt."

The exception for a buyer in ordinary course of business accommodates the interests of all parties. Buyers desire to be free of the lender's interest after they have committed themselves to paying for the goods. A buyer cannot easily determine how the seller finances its inventory, nor can the buyer afford to negotiate subordination agreements with the seller's lenders for each purchase made. Secured creditors at some point expect to surrender their security interest in the goods and look to the proceeds of a sale for repayment of the loan. The secured creditor thus depends on the goods being sold. The secured lender expects a constant flow of inventory in and out of the seller's possession; it is usually in the business of lending funds and is in a better position to take precautions against the loss of its security. Baird & Jackson, *Possession and Ownership: An Examination of the Scope of Article 9*, 35 Stan. L. Rev. 175, 209–210 (1983); 1961 Report of the Wisconsin Legislative Council, vol. III—Part II, pp 33–34, reprinted in 40C West's Wisconsin Statutes Annotated, ch. 409, p. 124 (1964).

Although the Code protects the buyer in ordinary course of business, the Code provides no explicit guidance to the question presented in this case, namely *when* does a purchaser under a contract for sale achieve the status of buyer in ordinary course of

business. There are at least five possible dates on which a purchaser may be viewed as having achieved the status of buyer in ordinary course of business: (1) the date of initial contract; (2) the date the goods are identified; (3) the date title passes to the purchaser; (4) the date the purchaser gets delivery; and (5) the date the purchaser accepts the goods.[1] Quinn, *Uniform Commercial Code Commentary and Law Digest,* sec. 9–307 [A] [8] (1987 Cum. Supp. No. 2); Note, *When Does a Buyer Become a Buyer in Ordinary Course? U.C.C. §§ 1–201(9), 9–307(1): A Test and a Proposal,* 60 Neb. L. Rev. 848, 852 (1981).

Relying on *Chrysler Corp. v. Adamatic,* 59 Wis. 2d 219, 208 N.W.2d 97 (1973), the Bank maintains that the purchasers can not become buyers in ordinary course of business who take free of the seller's secured creditor until the purchasers take title or delivery of the van. Because the purchasers in this case did not take title or delivery, the Bank contends that the purchasers do not take free of its interest as the dealership's secured creditor.

The *Chrysler* court faced almost the same issue that this case presents, although the facts of the two cases are different. In the *Chrysler* case Chrysler

[1]In similar but not precisely the same fact situations, several courts have adopted dates ranging from initial contract through identification. *Martin Marietta Corp. v. N.J. Nat. Bank,* 612 F.2d 745 (3d Cir. 1979); *Matter of Darling's Homes,* 46 Bankr. 370 (Bankr. D. Del. 1985); *Carey Aviation, Inc. v. Giles World Marketing, Inc.,* 46 Bankr. 458 (Bankr. D. Mass. 1986); *Rex Financial Corp. v. Mobile America Corp.,* 119 Ariz. 176, 580 P.2d 8, 10 (Ariz. Ct. App. 1978); *Wilson v. M. & W. Gear,* 110 Ill. App. 3d 538, 442 N.E.2d 670 (1982); *Herman v. First Farmers State Bank of Minier,* 73 Ill. App. 3d 475, 392 N.E.2d 344, 346 (1979); *Chrysler Credit Corp. v. Sharp,* 56 Misc. 2d 261, 288 N.Y.S. 2d 525 (1968); *Serra v. Ford Motor Credit Co.,* 463 A.2d 142 (R.I. 1983).

brought an action of replevin, seeking possession of several machines it had contracted to purchase from defendant Adamatic, Inc. Lakeshore Commercial Finance Corporation intervened, asserting ownership of the machines because of its prior perfected security interest in the goods in question.

Adamatic had agreed to build several machines for Chrysler, and Chrysler agreed to make progress payments on the machines. Chrysler made payments until the machines were nearly paid in full. When Adamatic's financial condition worsened, Lakeshore Commercial informed its borrower Adamatic that it would be forced to liquidate the loan and directed Adamatic not to ship the machines to Chrysler. The trial court concluded that Chrysler was a buyer in ordinary course of business and held that Chrysler's interest in the machines was superior to that of Lakeshore Commercial.

This court concluded that Chrysler was not a buyer in ordinary course of business. The court reasoned that for there to be a "buyer" there must be a sale. The court then looked to the definition of "sale" in sec. 402.106(1), which defines sale as "the passing of title from the seller to the buyer for a price." In the *Chrysler* case, Chrysler was not a buyer in ordinary course because title did not pass to Chrysler before the creditor took possession of the goods. The court said that if Chrysler had obtained title to the goods, its status as a buyer in ordinary course of business would not be defeated merely because it had not taken possession. *Chrysler Corp., supra* 59 Wis. 2d at 239.[2]

---

[2]While the court relied on the Code's definition of sale, the court did not consider the Code's definition of buyer. The Code defines buyer as one "who buys or contracts to buy goods." Sec.

The *Chrysler* court concluded that "sound policy considerations in the instant situation would seem to dictate that the rights of a secured creditor ought not be impaired in the absence of a physical transfer or assignment of the goods." *Chrysler Corp., supra* 59 Wis. 2d at 240.

The court acknowledged in *Chrysler* that "from the viewpoint of equity, this is an unsatisfactory result, for the record shows that, prior to the replevin, Chrysler had substantially paid the contract price for all the goods involved." 59 Wis. 2d at 241–42. Nevertheless the court also concluded that the result could be justified because Chrysler was fully aware of the debtor's precarious financial condition and could have obviated the very situation which resulted by taking appropriate precautions.

The *Chrysler* case was one of the first cases to consider the issue of when a purchaser becomes a buyer in ordinary course of business. The cases and commentaries that have considered the issue since *Chrysler* have generally been critical of the reasoning the court employed in *Chrysler*.[3]

The purchasers urge the court to overrule *Chrysler Corp. v. Adamatic* and to hold that they became

402.103(1)(a). The Code does not define buyer in terms of one who takes title to goods.

[3]For discussions of the *Chrysler* case, see, *e.g.,* Baird & Jackson, *Possession and Ownership: An Examination of the Scope of Article 9,* 35 Stan. L. Rev. 175, 210, n. 102 (1983); Dolan, *The Uniform Commercial Code and the Concept of Possession in the Marketing and Financing of Goods,* 56 Tex. L. Rev. 1147, 1154–1159 (1978); Note, *When Does a Buyer Become a Buyer in Ordinary Course? U.C.C. §§ 1–201(9), 9–307(1): A Test and a Proposal,* 60 Neb. L. Rev. 848, 869–875 (1982); Skilton, *Buyer in Ordinary Course of Business under Article 9 of the Uniform Commercial Code,* 1974 Wis. L. Rev. 1, 16–21.

buyers in ordinary course of business when the goods became identified to the contract.

We have reconsidered our analysis in *Chrysler* and are persuaded by the reasoning of the commentators and courts which have, since our decision in *Chrysler Corp. v. Adamatic,* addressed the issue presented in this case. The commentators and courts have, for the most part, opted for an earlier date than the date that title passed as the time when a purchaser achieves the status of a buyer in ordinary course of business.[4]

---

[4]Commentators and courts have been critical of using the date of delivery of goods as the dispositive date for purchaser becoming a buyer in ordinary course of business. As Professor Grant Gilmore, one of the drafters of the UCC, noted, sec. 409.307(1) was patterned after a comparable provision in the Uniform Trust Receipts Act (UTRA). The UTRA definition of buyer in ordinary course is similar to the UCC definition. The major distinction is that the UTRA definition expressly provides that the buyer must receive delivery in order to qualify as a buyer in ordinary course of trade. Sec. 1 of UTRA defines "buyer in ordinary course of trade" as "a person to whom goods are sold and *delivered* for new value and who acts in good faith and without actual knowledge of any limitation on the trustee's liberty of sale, including one who takes by conditional sale or under a pre-existing mercantile contract with the trustee to buy the goods delivered, or like goods, for cash or on credit."

Professor Gilmore concluded:

"Since the 'buyer in the ordinary course' definition in the Code so closely follows the comparable definition in UTRA, it would be reasonable to assume that the omission of the delivery requirement was deliberate, with the result that the Code buyers will be protected against security interest in the goods they buy at an earlier stage than UTRA buyers were protected against trust receipts." 2 Gilmore, *Secured Interests in Personal Property,* sec. 26.6, p. 696 (1985).

We conclude that we erred in relying on the date of transfer of title as the date on which a purchaser becomes a buyer in ordinary course of business. Reliance on the concept of title is contrary to the thrust of the Uniform Commercial Code and the commentary. The drafters of the Uniform Commercial Code tried to avoid giving technical rules of title a central role in furthering the policies of the Uniform Commercial Code. See, *e.g.,* secs. 402.401, 409.202, Stats. 1985–86. Although title questions may be of significance in determining some issues under the Code, we conclude that reliance on title to interpret sec. 409.307(1) is an unduly narrow and technical interpretation. See *Chrysler Credit Corp. v. Sharp,* 56 Misc. 2d 261, 288 N.Y.S.2d 525, 529 (1968).

While Professor Quinn notes that the selection of the passage of title as the date to qualify the purchaser as a buyer in ordinary course of business is "quite manageable," the author concludes that the drafters of the Code had an antipathy to the use of title as a Code problem solver. *Uniform Commercial Code Commentary and Law Digest,* sec. 9–307[A][8], p. S9–312 (1987 Cum. Supp. No. 2). Professor Robert Skilton voiced a similar criticism, writing as follows:

> "In holding that Chrysler had not attained the status of buyer in ordinary course of business, perhaps the court cannot be faulted. But, one may be surprised that Article 2, with its avowed mission to downgrade the title route in determining rights in goods in the transitional period from contract to performance, should leave such an important area as the present to the title tests of section 2–401.
> "Emphasis upon a title-passing test means that *until* title passes, either according to the

contract or through seller's delivery of the goods, the 'executory buyer's' status is in jeopardy. He is subject to the superior rights of an inventory secured party and runs the risk of being advised that the sale to him is in violation of the security agreement, so that he may never become a buyer in ordinary course of business. Can this be right? If so, something seems to be lacking." Skilton, *Buyer in Ordinary Course of Business under Article 9 of the Uniform Commercial Code,* 1974 Wis. L. Rev. 1, 17–19.

Courts have overwhelmingly rejected a definition of buyer in ordinary course that focuses on whether title has passed.[5] These courts reason that the inventory financer is better able to guard against the risks inherent in this type of financing than is the average retail buyer because the financer is more knowledgeable and has the resources to guard against the risks. These courts conclude that placing the burden on the buyer would inhibit retail sales.

Furthermore, focusing on the words "in ordinary course," these courts reason that a court must consider the substance of the transaction; a court must look to the customary manner in which sales are made in the seller's business and to the expectations of the buyer under the contract. The language "in ordinary course" indicates deference to commercial practice and is consistent with the purposes and policies underlying the Code "[t]o permit the continued expansion of commercial practices through custom, usage and agreement of the parties." Sec. 401.102(2)(b), Stats. 1985–86. If it is customary in the seller's business to sell goods in a particular manner (*e.g.,*

[5]See cases listed *supra* n. 1.

seller and purchaser enter into a contract for sale and purchaser makes a down payment), then the court may find that the purchaser who makes a down payment without taking title is a "buyer in ordinary course of business." See, *e.g., Carey Aviation, Inc. v. Giles World Marketing, Inc.,* 46 Bankr. 458, 463 (Bankr. D. Mass. 1985); Dolan, *The Uniform Commercial Code and the Concept of Possession in the Marketing and Financing of Goods,* 56 Tex. L. Rev. 1147, 1186–1187 (1978).

The purchasers in this case ask the court to reject the title or delivery date in this case and adopt an "identification" date as the date on which they became buyers in ordinary course of business. The purchasers rely on sec. 402.501(1), which provides that a buyer obtains a special property interest on identification. Sec. 402.501(1) provides:

> "Sec. 402.501 (1). The buyer obtains a special property and an insurable interest in goods by identification of existing goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them. Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs:
> "(a)   When the contract is made if it is for the sale of goods already existing and identified;
> "(b)   If the contract is for the sale of future goods ... when goods are shipped, marked or otherwise designated by the seller as goods to which the contract refers ...."

The purchasers argue that adoption of the identification date strikes a fair balance between the interests of the buyer in ordinary course and the

secured party. The purchasers argue that once the goods have been identified they have an insurable interest in the goods and can maintain an action against a third party who has injured them through his or her dealings with the goods. The purchasers reason that their interest at identification justifies considering them buyers in ordinary course at that time.

The purchasers conclude that they became buyers in ordinary course of business when the van became identified to the contract, that is, when is was produced or when GM sent the Bank the sight draft including the vehicle identification number. We need not decide in this case which is the appropriate date of identification.[6] Whichever date, the purchaser would prevail over the Bank. Because the purchasers do not ask this court to adopt the date of contract as the triggering date for transforming the purchasers to buyers in ordinary course,[7] we need not decide this issue.

We merely hold today that the purchasers became buyers in ordinary course of business when the goods became identified to the contract. We rest our decision on the circumstances surrounding the transaction in this case and the manner in which sales are made in this industry.

---

[6]Professor Quinn criticizes selection of the identification date, "a very early date in the normal sale sequence," because identification "was deemed of monumental unimportance by the drafters of the Code." Quinn, *Uniform Commercial Code Commentary and Law Digest,* sec. 9–307 [A][8] p. S9–313 (1987 Cum. Supp. No. 2).

[7]Although the purchasers' brief mentions the date of the initial contract as a possible determinative date, the briefs and oral argument stress the date of identification as the determinative date.

■ This case presents the situation that sec. 409.307 (1) was designed to address. The purchasers were ordinary retail consumers purchasing a vehicle from a dealership, an entity in the business of selling vehicles. The purchasers made a down payment and signed a contract. The Bank as financer of the inventory authorized the sale of the inventory. It was only through the sale of the inventory that the Bank would receive cash from the dealership to repay the loan. The Bank knew of the purchasers. The Bank knew of the purchase order and paid the manufacturer for the vehicle in question on September 30, 1983.

In its amicus brief the Wisconsin Bankers Association states that protecting the purchasers in this case will make a security interest in inventory an unworkable concept. The position we adopt today is the position most courts have adopted, concluding that the floor plan financer can guard against the risks. *Chrysler Credit, supra* 288 N.Y.S.2d at 534; *Wilson v. M&W Gear,* 110 Ill. App. 3d 538, 442 N.E.2d 670, 675 (1982). The Bank was in a better position than the purchasers to guard against the risk of loss. Most retail purchasers probably have never heard of the Uniform Commercial Code and would not know how to go about protecting their interest. The Bank, on the other hand, is in the business of lending money and has access to information about how to protect itself, as best it can, against risk of loss. Accordingly, under the facts of this case, we hold that the purchasers were buyers in ordinary course of business upon identification of the merchandise to the contract. The purchasers assert that the van had been identified to the contract before the Bank took over the dealership's premises and that their interest prevails over the

Bank's. Because it is unclear whether the Bank disputes the date of identification, this issue may have to be resolved in remand.

For the reasons set forth we reverse the judgment of the circuit court and remand the cause for further proceedings consistent with this opinion.

*By the Court.*—The judgment of the circuit court is reversed and the cause remanded.

JUSTICE WILLIAM G. CALLOW did not participate.