**PACIFIC PRODUCTS, INC., Appellant,**

v.

**GREAT WESTERN PLYWOOD, LTD., Appellee.**

No. 17634.

Court of Civil Appeals of Texas, Fort Worth.

Sept. 5, 1975.

Rehearing Denied Oct. 3, 1975.

**288**

Bagby, McGahey, Ross & DeVore, Inc., and Terry B. Arnn, Arlington, for appellant.

Brown, Herman, Scott, Dean & Miles, and J. Shelby Sharpe, Fort Worth, for appellee.

## OPINION

SPURLOCK, Justice.

This is an appeal from a judgment against appellant Pacific Products, Inc., in the amount of $11,528.17 awarded after a trial before the court without jury. That sum of money represents the difference in the contract price for a railway carload of plywood ordered by Pacific and the price at which the seller, Great Western, was ultimately able to dispose of same, plus incidental expenses.

We affirm the judgment.

Appellee, Great Western, of Portland, Oregon, was a primary wholesaler of plywood products milled in the Pacific Northwest (now in receivership); appellant, Pacific Products, Inc., is a wholesaler of lumber located in Arlington, Texas. At some time during March or the first few days in April of 1973, long distance phone conversations were held between Roger Bunge, an agent of Great Western and one of Pacific's sales-

men, Craig Stephens, with regard to the purchase by Pacific of a railway carload of plywood for one of its local customers, Bush Lumber Company.

As a result, on the 4th or 5th of April, Pacific forwarded a purchase order and Great Western sent a written acknowledgment; these crossed in the mail. The order form from Pacific was of a standard format and provided that "All purchases are made in accordance with applicable association * Grading Rules and practices, unless stated otherwise"; the typewritten terms provided for an order of:

1  C/L  3/8 AC-BC TECO GS 5% SHOP

AC    296.00
BC    293.00
SHOP  251.60

These provisions reflect an order of one carload of 3/8 inch plywood composed of AC, BC and "Shop" grades of quality, with the quantity of shop grade to be no more than 5% of the total; AC is the best grade of these three and shop the lowest; "TECO GS" means the plywood will bear the grade stamp of Timber Engineering Company, one of several quality control organizations within the industry; the figures 296.00, etc., reflect the cost per thousand feet of the indicated grade. It is admitted that neither this document nor the acknowledgment specifies any particular quantity of grades AC and BC, whether by unit or percentage. The purchase order also provided the railcar would be delivered to the switching yard of the St. Louis Southwestern Railway (SSW) in Addison, Texas, near Dallas; it was signed and returned by Stephens.

The acknowledgment from Great Western lacked the proviso regarding association standards and provided:

mulgated by the Dept. of Commerce. U. S. Product Std. PS–1–66 is the standard for plywood of the type involved in this case.

---

* This refers to the American Plywood Association which in conjunction with the National Bureau of Standards develops standards for plywood which are subsequently pro-

TECO Grade Stamped Plywood
PS 1-66   Group I
AC/BC Shop developing
1   C/L  (30-36U)  3/8  48 X 96
**172 list**

This document also provided the carload was to be shipped to Pacific at the SSW yard in Addison.

In addition to the applicable explanations mentioned above, it is uncontroverted that "30-36U" reflects 30 or 36 units, there being eighty 48″ X 96″ sheets to a unit, and railcars hold either 30 or 36 units depending on the size of the car.

The shipment was made on May 3rd and Pacific received an invoice on May 11th, a Friday, which reflected for the first time the respective quantities of each grade, the total price for each quantity, and the total price for the entire order of $22,109.39, less $1,353.96 freight ($20,755.43). Prior to the receipt of the invoice, Pacific had given the railroad a written authorization to release the car to its customer on arrival, and after arrival on Monday (May 14th) it was switched to the customer's siding. In the meantime, the customer had been forwarded a copy of the invoice and it called Pacific on Monday claiming the shipment was not sufficient for its needs as the invoice showed far too much plywood of the BC grade. It is also unquestioned that the price of plywood had begun to fall rapidly prior to the arrival of the shipment.

The next day, May 15th, the car was opened and inspected by the customer in the presence of Pacific's agent and an observer from Great Western. The parties opened only one of the 30 units in the car and after examination the customer first and then Pacific declared the car to be refused; the next day Pacific gave Great Western written notice of rejection.

Great Western then asked for a "reinspection" by a disinterested quality control firm pursuant to Section A2 of the appendix to U. S. Product Standard PS 1-66, which provides in part:

A2. Shipment Reinspection Practices— Based on industry practices, the following information on reinspection of plywood shipments is offered purchasers of plywood:

All complaints regarding the quality of any shipment must be made within 15 days from receipt.

(a) If the grade of any plywood shipment is in dispute and a reinspection is demanded, the cost of such reinspection shall be borne by the seller if the shipment is more than 5% below grade, and the shipment shall be settled on the basis of the reinspection report.

The buyer need not accept those panels established as below grade, but shall accept the balance of the shipment as invoiced.

(b) If reinspection establishes the shipment to be 5% or less below grade, the buyer pays the cost of reinspection and pays for the shipment as invoiced.

The reinspection was done by a representative of Timber Engineering Company and in his report of June 7th he found the shipment to be in compliance with the "standard", even though it contained approximately 85% BC grade, since it had five percent (5%) or less of plywood below the grades ordered. Pacific still refused to accept the shipment and Great Western sold it some six months later at a dramatic loss. Subsequently, Great Western brought this suit and Pacific has appealed from the judgment of the trial court in favor of the former.

We will first consider Pacific's third point of error, by which it contends the trial court erred in striking the defense of fraud because same was filed in a timely manner and was properly before the court.

On the morning of trial, October 28, 1974, a hearing was to be held on Great Western's exceptions to the defendant's second amended original answer including a pleading which maintained that the agent of Great Western had verbally represented to

Pacific's salesman that the shipment in question would "contain 5% shop, 5–10% BC grade, and the remaining portion of the carload would be AC grade," and that Pacific had relied on such representation to its detriment. When the hearing began, however, Pacific announced it had just filed its third amended original answer, changing the before-mentioned pleading to one of fraud rather than "representation". The trial court then sustained Great Western's exception to this pleading on the basis of surprise and it is of this action which Pacific now complains.

Rule 63, T.R.C.P., provides: "Parties may amend their pleadings, . . . by filing such pleas with the clerk at such time as not to operate as a surprise to the opposite party; provided, that any amendment offered for filing within seven days of the date of trial . . . shall be filed only after leave of the judge is obtained, which leave shall be granted by the judge unless there is a showing that such amendment will operate as a surprise to the opposite party."

It is Pacific's contention that the plaintiff was not surprised by the defense of fraud pleaded on the morning of trial. It makes the statement that it had pleaded the question of representation in each of its answers prior to the third amended answer and the pleading of fraud was no more than an amplification of a prior pleading which was tendered to meet exceptions and to which it was entitled as a matter of law.

■ Under Rule 63, the trial court has great latitude in deciding whether or not to allow an amendment of pleadings within seven days of trial and his ruling will not be disturbed on appeal unless the complaining party makes a clear showing that the court abused its discretion. *Badgett v. Erspan,* 476 S.W.2d 381 (Fort Worth, Tex.Civ.App., 1972, no writ hist.). The burden of demonstrating that the trial court erred in refusing to permit a late filing of an amended pleading or trial amendment rests on the party contending such action was not justi-

fied by the rules, and the mere fact that the court refused to permit amendment is not sufficient. *Herrin Transportation Co. v. Parker,* 425 S.W.2d 876 (Houston, Tex.Civ. App., 1st Dist., 1968, writ ref., n. r. e.).

■ In this case, we note almost one year elapsed from the filing of defendant's initial answer to the day of trial and during that period Pacific amended its answer twice without mentioning fraud on the part of plaintiff as a defense; the record reflects that Great Western had gone to considerable expense in bringing witnesses from out of state in order to be prepared for the trial to begin as scheduled; Great Western complained vigorously of surprise and claimed the unanticipated defense of fraud would compromise its efforts on behalf of its client. On the basis of the record, we cannot say the trial court abused its discretion in refusing to allow Pacific to further amend its pleadings on the day of trial.

The third point of error is overruled.

Pacific's first point of error claims the trial court erred in holding that the exchange of the purchase order from Pacific and the written acknowledgment from Great Western constituted a contract between the parties because such were not sufficiently certain to be enforced, as a matter of law. More specifically, it contends that one cannot determine from the purchase order and acknowledgment the number of units of each grade, price for the total quantity of each grade, total quantity of plywood, or the final total price, and therefore the purported contract must fail due to the lack of expressed agreement as to certain material terms. It argues error by the trial court as a matter of law in making the following determinations:

Findings of Fact:

"6. The written order acknowledgment form of Great Western Plywood Ltd. acknowledged the same price per grade of plywood of A–C, B–C and shop as ordered by Pacific Products, Inc.

"30. The carload of plywood shipped in UP 111185 to Addison, Texas, was what was ordered by Pacific Products, Inc.

"50. The written order form sent by Pacific Products, Inc. to Great Western Plywood, Ltd. was not ambiguous.

"51. The written order acknowledgment sent by Great Western Plywood, Ltd. to Pacific Products, Inc. was not ambiguous."

Conclusions of Law:

"1. A written contract constituting the complete contract was entered into between Great Western Plywood, Ltd. and Pacific Products, Inc. when Pacific Products, Inc. received the written order acknowledgment of Great Western Plywood, Ltd., which was signed by Craig Stephens on behalf of Pacific Products, Inc. and which is heretofore referred to as Plaintiffs' Exhibit 'B'.

"2. The carload of plywood in UP 111185 received in Addison, Dallas County, Texas, complied fully with the written contract between Pacific Products, Inc. and Great Western Plywood, Ltd.

"3. The written contract between Pacific Products, Inc. and Great Western Plywood, Ltd. was for one carload of whatever size car was available of ⅜ inch thick plywood with unspecified percentages of A–C and B–C plywood and shop grade plywood as it developed. Great Western Plywood, Ltd. was to hold the shop developing to 5% of the car if possible."

■■■ As this case involves the sale of commercial goods between merchants, the applicable law is to be found in the Uniform Commercial Code as adopted in this state as part of our Business and Commerce Code. To the extent that prior law conflicts, it is supplanted by the Code. *Fredonia Broadcasting Corp., Inc. v. RCA Corporation,* 481 F.2d 781 (5th Cir., 1973). The objective of the Uniform Commercial Code, or any code, is to displace scattered legislation or decisional law, and to state as fully as practicable a comprehensive and workable set of rules and principles for the governing of all aspects of transactions in the field to which it applies. 3 Bender's U.C.C.Ser. (1975), Sec. 1.01. Of course prior law is applicable in so far as it is not displaced by specific provisions of the Code. Tex.Bus. & Comm. Code Ann., Sec. 1.103 (Tex.UCC, 1967).

In considering this point, we note that there are other salient determinations made by the trial court which are unquestioned on appeal:

Findings of Fact (unchallenged):

"1. Craig Stephens as a part of his regular duties mailed on behalf of Pacific Products, Inc. to Great Western Plywood, Ltd. a written order for one carload of ⅜ inch thick plywood. Said carload to contain an unspecified amount of A–C and B–C grades of plywood with a limitation on shop grade of plywood to the extent of 5% of the carload shipped.

"2. The price per grade of plywood of A–C, B–C and shop was set forth in the written order mailed by Craig Stephens on behalf of Pacific Products, Inc. to Great Western Plywood, Ltd.

"3. Craig Stephens was authorized by Pacific Products, Inc. to order the carload of plywood.

"4. Plaintiffs' Exhibit 'A' is a true and correct copy of the original order of Pacific Products, Inc.

"5. Upon receipt of the Pacific Products, Inc. written order Great Western Plywood, Ltd. mailed to Pacific Products, Inc. a written order acknowledgment stating one carload of ⅜ inch thick plywood with unspecified amounts of A–C, B–C and shop grades was being shipped.

". . .

"7. Plaintiffs' Exhibit 'B' is a true and correct copy of the written order acknowledgment mailed to Pacific Products, Inc.

"8. The written order acknowledgment form was received by Pacific Products, Inc. and Craig Stephens affixed his signature to the lower left portion on behalf of Pacific Products, Inc. as he was authorized to do.

"9. Craig Stephens on behalf of Pacific Products, Inc. returned a copy of the written order acknowledgment form of Great Western Plywood, Ltd.

"10. Several days prior to the arrival of the carload of plywood by rail in Addison, Dallas County, Texas, Pacific Products, Inc. received the invoice of Great Western Plywood, Ltd. stating that Union Pacific car number UP 111185 was en route to Addison, Texas, containing 240 pieces of ⅜ 48 x 96 A–C, 2000 pieces of ⅜ 48 x 96 B–C and 160 pieces of ⅜ 48 x 96 shop grades of plywood priced as per the written order of Pacific Products, Inc. for delivery to Pacific Products, Inc."

Additional Findings of Fact (unchallenged):

"1. That there are two sizes of railroad cars that carry either 30 units or 36 units of plywood.

"2. There are 80 pieces of plywood per unit of plywood."

Conclusions of Law (unchallenged):

"4. The language in the written order of Pacific Products, Inc. referring to the applicable association Grading Rules and practices incorporated the rules and practices as promulgated by the Department of Commerce and set forth in PSI–66 as a part of the written contract."

First, we will consider the alleged dissimilarity between the purchase order and the acknowledgment. Pacific argues the acknowledgment from Great Western contains no price at all (per unit or otherwise) and that this supposed variance from the purchase order contributes to the uncertainty of the contract; it states that the term "172 list" refers to a price list published by a third party and, since several price lists are published for this industry, there is no way of determining what prices apply. We disagree.

Mr. Roger Bunge, the agent for Great Western involved in these negotiations, testified that "172 list" was a reference to a standard price list used in the industry from which one could determine the prices of the various different qualities of plywood by simple mathematics. He stated that when this was done in this case, the acknowledgment reflected exactly the same prices as did the purchase order. On cross-examination, he admitted that there were different publications which printed the price list, but he stated the list itself never changed (was quoted the same by each publisher of price lists). This testimony was uncontradicted.

■ Since the record reflects the trial court's finding that the acknowledgment contained the same price per grade as the purchase order and there is some evidence to support such finding, we are bound by the finding even if we might have reached a different conclusion. *Sanders v. Sanders,* 469 S.W.2d 313 (Houston, Tex.Civ.App., 14th Dist., 1971, error dism.); 4 McDonald Texas Civil Practice, Sec. 16.10(b) (1971 Revision).

■ Pacific's primary argument under this point concerns the "uncertainty" of the contract due to the alleged lack of specificity of its terms, as previously mentioned herein. We conclude the agreement is not so uncertain that it is unenforceable; further, even if extrinsic evidence were admitted, there is evidence that Pacific's order was enforceable under industry usage.

The Texas Business and Commerce Code provides, in part:

"§ 1.102. Purposes; Rules of Construction; Variation by Agreement

"(a) This title shall be liberally construed and applied to promote its underlying purposes and policies.

"(b) Underlying purposes and policies of this title are

"(1) to simplify, clarify and modernize the law governing commercial transactions;

"(2) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

"(3) to make uniform the law among the various jurisdictions.

"(c) The effect of provisions of this title may be varied by agreement, except as otherwise provided in this title and except that the obligations of good faith, diligence, reasonableness and care prescribed by this title may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable."

The official comment to this Section states: "The Act should be construed in accordance with its underlying purposes and policies. The text of each section should be read in light of the purpose and policy of the rule or principle in question, as also of the Act as a whole, and the application of the language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved."

Section 1.205. "Course of Dealing and Usage of Trade"

"(d) The express terms of an agreement and an applicable course of dealing or usage of trade shall be construed wherever reasonable as consistent with each other; but when such construction is unreasonable express terms control both course of dealing and usage of trade and course of dealing controls usage of trade."

Section 2.201. "Formal Requirements; Statute of Frauds"

"(a) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing."

The official comment to this Section states: "The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. . . . The only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated. The price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted."

Section 2.202. "Final Written Expression: Parol or Extrinsic Evidence"

"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

"(1) by course of dealing or usage of trade (Section 1.205) or by course of performance (Section 2.208); and

"(2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

Section 2.204. "Formation in General"

"(a) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

"(b) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

"(c) Even though one or more terms are left open a contract for sales does not fail for indefiniteness if the parties have intend-

ed to make a contract and there is a reasonably certain basis for giving an appropriate remedy."

Section 2.305. "Open Price Term"

"(a) The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time for delivery if

"(1) nothing is said as to price; or

"(2) the price is left to be agreed by the parties and they fail to agree; or

"(3) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded."

In this case, Mr. Robert Germany, who did the reinspection for Timber Engineering Company, testified to the effect that the reinspection showed Pacific received what it ordered as reflected by the purchase order and acknowledgment; that there is no limitation by "usage" within the industry as to the maximum or minimum quantities of certain grades in a shipment; merchants within the industry do at times order by the carload without specifying quantities by grade. Mr. Harlan Niebling, the manager of the western office of the North American Wholesale Lumber Association (a trade association of wholesale distributors of forest products), testified to the effect that: the carload shipment complied with the purchase order from Pacific; there was nothing in the applicable commercial standards (referred to in the purchase order) which specifies particular percentages of any grade in a shipment mixed with another grade unless specified in the contract between buyer and seller. All this was in addition to the testimony of Mr. Bunge which was to similar effect.

In determining whether the trial court's findings are supported by any evidence of probative value, we will give credence only to the evidence favorable to the findings and will disregard all evidence to the contrary. *Brown v. Frontier Thea-*

*tres, Inc.,* 369 S.W.2d 299 (Tex.Sup.1963). When the evidence is examined in light of the applicable UCC provisions, we can only conclude there is some evidence from which the trial court could have determined that there was a reasonable good faith meeting of the minds as to the contract and that the shipment in question met the requirements of the contract. There is also some evidence of custom and usage to the effect that it was not unheard of, although perhaps unusual, to order plywood by the carload without specifying the quantities of each grade. We are therefore bound by the trial court's finding that the carload of plywood fully complied with the written contract. *Sanders v. Sanders,* supra.

The first point of error is overruled.

In its second point of error, Pacific argues that the trial court erred in holding it had waived its right to inspect and reject the shipment because, as a matter of law, the car was inspected and rejected in a timely manner. It says such error is shown in certain determinations made by the trial court as to questions of fact and law, but our examination of the record shows the only one of these determinations which in any way relates to the waiver by Pacific of any right of rejection and/or inspection is the following conclusion of law:

"6. Pacific Products, Inc.  . . . waived its right of inspection of the shipment when it exercised dominion over the shipment by having the St. Louis Southwestern Railway Company deliver it to its customer, S. P. Bush Lumber Company."

We do not find the specific term "exercise of dominion" in the Uniform Commercial Code as adopted in this state, however, Great Western states in its brief that it relies on that part of Section 2.606 which provides: "(a) Acceptance of goods occurs when the buyer  . . . (2) fails to make an effective rejection (Subsection (a) of Section 2.602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or (3) does

any act inconsistent with the seller's ownership . . .."

Paragraph (a) of Section 2.602 provides:

"(a) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."

Great Western contends that any right of inspection or rejection was waived because Pacific's action in directing the railroad to release the car to its customer was inconsistent with the seller's ownership and therefore the shipment was accepted when delivered to the Bush siding.

We find that Pacific rejected the shipment in a manner approved by the Code and did not waive its right of rejection.

The official comment to Section 2.606(a)(3) notes the provisions of that subsection are subject to the sections dealing with rejection. Those sections permit the buyer "to take certain actions with respect to the goods pursuant to his options and duties imposed by those sections, *without effecting an acceptance of the goods.*" (Emphasis ours.) One of the buyer's options is to "reject the whole" if the goods are nonconforming. Another, as previously noted, provides the buyer must do so within a reasonable time and with "seasonable" notice to the seller. Section 2.602(a).

The findings of fact reflect that Pacific received the invoice which specified the quantities of each grade in the shipment on Friday, May 11th; Pacific had given a written directive to the SSW Railway Company on May 8th telling it to deliver the car to Bush Lumber Company on its arrival and did not cancel same or request an inspection prior to the delivery; the car arrived at the railroad's Addison yard on Monday morning, May 14th, and was switched to the Bush siding by 9:00 P.M. the same day; the next day, May 15th, Pacific orally notified Great Western that the shipment was rejected; and on May 16th written notification of rejection by telegram was given.

There was testimony from the SSW Railroad freight agent who had handled the car that it arrived consigned to Great Western; on being contacted, Great Western told the agent to take instructions from Pacific as to disposition of the car; the agent then switched the car to the Bush siding per Pacific's written instructions; that since the car had arrived consigned to the shipper, he would not have allowed even Pacific to inspect it prior to its release by Great Western; release instructions are usually in hand prior to the arrival of the car; and the railroad did not contact Pacific on the 14th regarding the disposition of the car since it already had the written release.

The record reflects other testimony to the effect that the invoice received by Pacific on the 11th was processed and forwarded to Bush Lumber Company on the same day, but Pacific's salesman did not see a copy of the invoice until he was contacted by Bush on Monday, the 14th, as to the excessive amount of BC reflected therein; in order to complete the sale Pacific then tried to convince Bush that the BC grade would be satisfactory for its needs; Pacific did not know the car had actually arrived until so informed by Bush; the inspection by Pacific and Bush on the 15th was, in part, an attempt to salvage the sale.

The determination of whether the actions of the buyer under Sections 2.602 and 2.606 amount to acceptance or an effective rejection in a particular case is generally made by the trier of fact. *Chrysler Corp. v. Adamatic, Inc.,* 59 Wis.2d 219, 208 N.W.2d 97 (1973); *HPS, Inc. v. All Wood Turning Corp.,* 21 N.C.App. 321, 204 S.E.2d 188 (1974). The overlapping considerations are: 1. Did the buyer give notice within a reasonable time? 2. Did the buyer treat the goods in a manner so inconsistent with seller's ownership that its attempt at rejection must fail even though given within a reasonable time? The latter instance may be reflected by payment of the purchase price, use of the goods, changing the identity of the goods, or a combination of the foregoing. 67 Am.Jur.2d, "Sales", Sections

382–385 (1973). See also *Bowen v. Young*, 507 S.W.2d 600 (El Paso, Tex.Civ.App., 1974, no writ hist.).

In this case, Great Western admits Pacific did not wait an inordinately long period of time prior to inspection and the giving of notice of rejection. Therefore, the point turns on whether or not Pacific's written directive to the railroad to release the car to Bush was an action inconsistent with seller's ownership; i. e., did Pacific "waive" its right of rejection. We are of the opinion it did not.

Other than general references to the before mentioned sections of the Code, Great Western relies on one pre-Code case for the foregoing proposition. *Pittman-Harrison Co. v. Fox Bros.*, 228 S.W. 579 (Texarkana, Tex.Civ.App., 1921, no writ hist.).

In that pre-Code case, the buyer ordered a car of certain quantities of various grades of peas and the bill of lading specified that inspection was to be allowed. When the shipment arrived, it had no bill of lading and the peas were unloaded into the buyer's own warehouse for purposes of inspection. Finding the shipment to vary from its order, the buyer tendered payment for the conforming portion of peas and rejected the rest. The seller refused to accept the rejected peas and the shipper ultimately disposed of them. The seller then sued the buyer on the theory that the unloading and storage of the peas for 13 days amounted to a conversion of the latter's property.

In *rejecting* this theory, the appellate court held the buyer had merely been exercising its right of inspection according to the terms of the contract and the shipment was still under the control of the seller even though unloaded, inspected, rejected, and stored for a period of time by the buyer. The decision in that case does not support the position of Great Western.

■ Although we have noted that we must acquiesce in the findings of the trial court where there is evidence in support thereof, *Sanders*, supra, it is also true that we are not bound when we can determine from a record which includes a statement of facts that the evidence in support of the questioned finding is legally or factually insufficient. 4 McDonald, Texas Civil Practice (1971 Rev.), Sec. 16.10, Sub. (b).

As we have noted, the Code is intended to provide a comprehensive and workable set of rules governing commercial transactions and supplants prior law to the extent of any conflict. The Code emphasizes the concepts of good faith and commercial reasonableness. It has been said that the single most important innovation of Article 2 is its restatement of the responsibilities of the parties in terms of operative facts rather than legal conclusions: where pre-Code law looked to "title" for the definition of rights and remedies the Code looks to demonstrable realities such as custody, control, and professional expertise. 73 Yale L.Jour. 201 (1963), article by Ellen A. Peters, entitled "Remedies For Breach of Contracts Relating to the Sale of Goods Under the Uniform Commercial Code: A Roadmap for Article Two".

In addition to the sections cited by appellee, the following also applies in this case:

Section 2.513. "Buyer's Right to Inspection of Goods"

"(a) Unless otherwise agreed    .    .    .    where goods are tendered or delivered or identified to the contract for sale, the buyer has a right before payment or acceptance to inspect them at any reasonable place and time and in any reasonable manner. When the seller is required or authorized to send the goods to the buyer, the inspection may be after their arrival."

The official comment in this section states: "The buyer may exercise his right of inspection at any reasonable time or place and in any reasonable manner. It is not necessary that he select the most appropriate time, place or manner to inspect or that his selection be the customary one in the trade or locality. Any reasonable time, place or manner is available to him and the reasonableness will be determined by trade

usages, past practices between the parties and the other circumstances of the case.

"The last sentence of subsection (1) makes it clear that the place of arrival of shipped goods is a reasonable place for their inspection."

Given these provisions, we see no way in which Pacific's action in giving a release to the railroad could act as a "waiver" of its rights absent some other controlling Code provision or rule of law. Pacific inspected and rejected the car within 2 working days of its receipt of the invoice and gave written notice of rejection within two days of the car's arrival. Under the facts of this case, such action was a timely rejection and, in the absence of any evidence of a specific agreement to accept the car or the transfer of a legally binding document of title, the second point of error must be sustained. However, this point does not affect the disposition of this appeal since the shipment, as previously noted, did conform to a contract which was enforceable under the applicable provisions of the Texas Business and Commerce Code and the seller was therefore entitled to the redress afforded to him by the court below.

The judgment is affirmed.