TATE, Circuit Judge,
concurring in part and dissenting in part:
I cannot join the majority in its resolution of the threshold question of which state’s law should provide the rule of decision in this case. (I do, however, agree with its resolution of the other issues of the appeal.[1]
In my view, the majority has misperceived the nature of the question before this court; To be decided by us is a funda *415 mental question of national commercial law that should be resolved in furtherance of the overriding policy of national uniformity ratified by the legislature of Texas when it adopted the Uniform Commercial Code. The issue is not, as the majority characterizes it, a simple choice of law question to be resolved by balancing the competing state policies embodied in the respective usury laws of Texas and Mississippi.[2]
Perhaps, as a practical matter, no great harm is done by invalidating the party choice of law in the present case: the loan is usurious in both Texas and Mississippi. But what if it were not? What if the party choice of lender law had served to validate a transaction usurious under borrower law? Would the “strong policy” perceived by the majority in the Texas jurisprudence override the party choice of law, invalidate the transaction (non-usurious in the state where executed), and subject the lender to the usury penalties of the borrower’s state? Might the result in that circumstance differ? Might the result differ depending on whether the courts of Texas or of Mississippi were addressing the issue?
These questions suggest the basic flaw that I perceive in the majority’s approach: It has settled upon a rationale that pits the parochial policies underlying the usury laws of a single jurisdiction irreconcilably against the policy of national uniformity embodied in the Uniform Commercial Code, and has done so unnecessarily.
I am not inclined to believe the courts of Texas would likewise overlook the UCC choice of law enacted by the Texas legislature, in the interest of a uniform national commercial law, by which transactions would be similarly enforceable by the courts of whatever jurisdiction in which suit is brought. My distinguished brethren of the majority err, in my opinion, in presuming otherwise.
I.
Although the majority correctly determined that Texas should provide the rule by which the choice of law would be made in these bankruptcy proceedings, Vanston Bond Holders Protective Committee v. Green, 329 U.S. 156, 161-162, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946), it nevertheless proceeded, in my view, incorrectly to select an inappropriate Texas rule.[3] The statuto *416 rily-applicable rule is that found in Section 1.105(a) of Texas’ version of the UCC:
Except as provided hereafter in this section, when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties.
Tex.Bus. & Com.Code Ann. tit. 1, § 1.105(a) (Vernon Supp.1979), UCC § 1-105(1) (1972 version). Pre-UCC choice of law jurisprudence, relied upon for guidance by the majority, is an inappropriate basis for decision, in the face of this legislative replacement of jurisprudential choice of law rules by a statutory one.
The majority's error in this regard contravenes both Texas and Fifth Circuit decisions. As this court noted in Fredonia Broadcasting Corp., Inc. v. RCA Corp., 481 F.2d 781, 801 (5th Cir. 1973):
The Uniform Commercial Code sections [citing Vernon’s Texas Business and Commercial Code] require that prior Texas case law give way. No Texas case nor any other state court in this Circuit has faced this exact problem. Therefore, we look to the provisions of the Uniform Commercial Code for an interpretation, as would a Texas state court.
The Texas courts are in accord:
To the extent that prior case law conflicts it is supplanted by the Code. The objective of the Uniform Commercial Code, or any code, is to displace scattered legislation and decisional law, and to state as fully as practicable a comprehensive and workable set of rules and principles for the governing of all aspects of transactions in the field to which it applies.
Pacific Products v. Great Western Plywood, 528 S.W.2d 286, 291 (Tex.Civ.App.—Ft. Worth 1975) (citations omitted).
In looking to the pre-UCC jurisprudence for the available choice of law rule in this case, the majority has fallen into a basic methodological error that obscures the issues truly at stake and threatens to undermine the fundamental objectives of the uniform commercial laws adopted by the state legislatures of this nation.
II.
Section 1.105 establishes the rule that parties to a multi-state transaction are free to choose the law that will govern their rights and obligations so long as the jurisdiction whose law is chosen bears a “reasonable relation” to their transaction. Tex. Bus. & Com.Code Ann. tit. 1, § 1.105, Comment 1 (Vernon 1968), UCC § 1-105, Comment 1 (1962 version).
The substantive content of this “reasonable relation” test is illuminated by the case of Seeman v. Philadelphia Warehouse Co., 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123 Tex. Bus. & Com.Code Ann. tit. 1, § 1.105, Comment 1 (Vernon 1968), UCC § 1.105, Comment 1 (1962 version). Seeman dealt with a loan from a Pennsylvania lender to a New York borrower under conditions held to be usurious under New York law but non-usurious under Pennsylvania law. The contract did not contain a choice of law provision, but did provide for repayment of the loan in Pennsylvania. The United States Supreme Court stated the rule that, in order to further “a policy of upholding contractual obligations assumed in good faith,” it would allow parties to contracts made in one state but to be performed in another to stipulate for the higher of the two applicable rates of interest. The Court went on to state:
A qualification of [this rule], as sometimes stated, is that the parties must act in good faith, and that the form of the transaction must not “disguise its real character.” As thus stated, the qualification, if taken too literally, would destroy the [rule itself] for [it] obviously [is] to be invoked only to save the contract from the operation of the usury laws of one jurisdiction or the other. The effect of the qualification is merely to prevent the *417 evasion or avoidance at will of the usury law otherwise applicable, by the parties’ entering into the contract or stipulating for its performance at a place which has no normal relation to the transaction and to whose law they otherwise would not be subject. Wharton, ... in discussing this qualification, says: “Assuming that their real, bona fide intention was to fix the situs of the contract at a certain place which has a natural and vital connection with the transaction, the fact that they were actuated in so doing by an intention to obtain a higher rate of interest than is allowable by the situs of some other elements of the transaction does not prevent the application of the law allowing the higher rate.”
Seeman v. Philadelphia Warehouse Co., 274 U.S. at 408, 47 S.Ct. at 628, (italics mine).
Read in the light of Seeman, the “reasonable relation” test of Section 1.105(a), adopted with specific comment reference to that decision, limits party autonomy in the choice of law only to the extent that it forbids them to select the law of a jurisdiction that has “no normal relation to the transaction.” That the intent of their choice of law provision was to avoid the usury laws of some interested jurisdiction is immaterial — they are perfectly free to do so. What they are forbidden to do is to evade those laws at will, capriciously or fraudulently, by selecting the law of a jurisdiction without a normal relation to the transaction or by contriving contacts with an otherwise non-interested jurisdiction so as to validate their choice of law:
Only when it is shown that the contract did not occur in the normal course of the transaction, but was contrived to validate the parties’ choice of governing law, should the relationship be held unreasonable; in other cases the clause should be upheld. Courts should guard against combining notions of sovereignty in choice of law with the flexibility of the Code’s “reasonable relation” test to strike down the selected law — leaving the parties with an uncertainty which the Code was designed to eliminate.
Nordstrom & Ramerman, The Uniform Commercial Code and the Choice of Law, 1969 Duke L.J. 623, 628 (1969) (italics mine).
This reading of Section 1.105 is in keeping with the UCC’s underlying purpose of establishing a nationally uniform law to govern commercial transactions. UCC § 1-102(b)(3), enacted in Texas as Tex.Bus. & Com.Code Ann. tit. 1, § 1.102(b)(3) (Vernon 1968).[4] The Code’s devotion to the principle of party autonomy, particularly in the choice of law area, is but a reflection of that policy. By calling upon state courts to yield to party choices of law in multi-state transactions, except where it would be unreasonable to do so, the Code attempts to achieve uniformity. The uniformity arises from the ability of multi-state contractants to select the law that will govern their transactions in the full expectation that their choice will be respected by whatever court might chance to hear their dispute. See J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 3 (2d ed. 1980).
III.
Having determined that UCC § 1-105 as adopted by the legislature of Texas is the applicable choice of law rule, and that such statutory section requires the courts of Texas to yield to the party choice if the chosen jurisdiction bears a reasonable relation to the transaction, we must now determine whether the courts of Texas have held or would hold that the relationship borne by Mississippi to this transaction is not reasonable within the meaning and application of Section 1.105(a).
*418 It is clear from the record, and I would concur with the majority and the courts below, that the state of Texas has the most significant contacts with this transaction. The question, however, is not which state has the greater contacts, but rather whether Mississippi’s contacts are sufficient to constitute a “reasonable relation” within the meaning of Section 1.105(a). Briefly stated, Mississippi’s contacts with this transaction are as follows:
1. Mississippi is the site of the lender’s home office, although the lender does have places of business in Texas.
2. The agreement was forwarded to Mississippi for acceptance by Woods-Tucker and was accepted there.
3. The borrowed money was sent from Mississippi to Texas.
A.
Have Texas courts held that these contacts are insufficient?
My reading of the Texas decisions would indicate that they have not. The five cases cited by the majority simply do not support a contrary conclusion. Three of them upheld the party choice of law, and therefore cannot be said to indicate much, if anything at all, about the precise point at which a jurisdiction’s contacts with the transaction become too tenuous to be “reasonable” (Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024 (1891); Hi-Fashion Wigs Profit Sharing Trust v. Hamilton Investment Trust, 579 S.W.2d 300 (Tex.Civ.App.—Eastland 1979); Securities Investment Co. v. Finance Acceptance Corp., 474 S.W.2d 261 (Tex.Civ. App.—Houston (1st Dist.) (1971)). A fourth case, Gutierrez v. Collins, 583 S.W.2d 312 (Tex.1979), is a tort case, not involving any party choice of law, the “reasonable relation” test of Section 1.105(a), or the policy considerations that arise in multi-state commercial transactions, and is thus inapposite to the case before us. The fifth case, Building and Loan Ass’n of Dakota v. Griffin, 90 Tex. 480, 39 S.W. 656 (1897), involves a commercial situation similar to the present one (although lacking some foreign state contacts present in the instant case); it is the only decision cited which does overturn a party choice of law.
Griffin, however, is a pre-UCC case, decided in 1897 without consideration of the policies underlying the UCC and adopted in Texas by its legislature through the enactment of the Texas UCC in 1967. To the extent that its result would differ from that under Section 1.105(a), Griffin’s choice of law rule has been supplanted by Texas UCC § 1.105(a). See Pacific Products v. Great Western Plywood, 528 S.W.2d 286, 291 (Tex.Civ.App.—Ft. Worth 1975), quoted in Part I of this dissent. Griffin is persuasive authority that, prior to the 1967 enactment of the Texas UCC by the Texas legislature, the Texas courts might have dishonored the party choice of law, as did the present majority under the circumstances before us. Nevertheless, Griffin is arguably distinguishable as based upon a factual determination that the jurisdiction selected by the parties had no contacts at all with the transaction: The parties did not really intend their contract to be performed there, and the only other contact was that it was the lender’s state of incorporation — but the court found that the lender had become domiciled in Texas for the purpose of lending money. Building and loan Ass’n of Dakota v. Griffin, 90 Tex. at 488, 39 S.W. at 659. The court held that the Texas lender’s agreement to pay the debt incurred in Texas at the home office of the foreign corporation was merely a “contrivance . intended to evade the laws” of Texas. Id.
Cited decisions, insofar as they are even apposite to the present case, do not demonstrate that Texas courts will apply Texas choice of law rules so as always to assure the application of the usury laws of the borrower’s state. On the contrary, they exemplify a conflicts rule honoring party choices of law that is abrogated only upon clear evidence that the party choice is unreasonable within the meaning of Section 1.105(a). No other cases cited by the parties, cited by the majority, or located by this writer would lead to any other conclusion. *419 Since Texas has not ruled upon the particular facts that now face this court, we should seek to decide as would the high court of that state. Fredonia Broadcasting Corp., Inc. v. RCA Corp., 481 F.2d 781, 801 (5th Cir. 1973).
B.
As noted above, the state of Mississippi is not devoid of contacts with this transaction — it is the site of the lender’s home office, the place of acceptance of the contract, and the place from which the loaned money was sent. Would the courts of Texas hold these contacts insufficient if faced with the question now before this court? I do not think they would.
My own Erie guess is that these contacts, viewed in the light of UCC policy as ratified by the Texas legislature by its adoption of Section 1.105(a), would be found sufficient to constitute a reasonable relation between Mississippi and this transaction. Thus, the party choice of law would be honored unless it was found to constitute a contrivance to evade the usury laws of Texas.
Indeed, the basis upon which the bankruptcy court struck down the party choice of law, and upon which the majority affirmed that holding, is that the choice of Mississippi law was a contrivance to avoid the usury laws of Texas. I would affirm the district court’s conclusion that that holding is clearly erroneous.
The bankruptcy court held:
[T]he sale and leaseback transaction between Plaintiff and Debtor was not a true lease, [and] the transaction was, from the beginning, contemplated to be in the nature of a secured loan transaction. As such, it was more than a contrivance to evade the income tax laws of the United States. In looking to the substance of the contract, a contrivance exists likewise to evade the usury statutes of the State of Texas. This being so, the law of the State of Texas will govern in spite of any written provision in the contracts making the law of Mississippi applicable (Building and Loan Assn. v. Griffin, 90 Tex. 480, 39 S.W. 656 (1897)).
In affirming this holding of the bankruptcy court the majority cites two grounds:
First, the fact that the parties in this case styled their transaction as a sale-leaseback instead of a secured loan supports a finding of a device or contrivance to evade the Texas usuary laws. Second, the provision in the agreement in this case that the laws of Mississippi shall apply is a device to evade the Texas usury laws just as the provision that payments on the loan in Griffin be made in Dakota was conclusive evidence of a device to evade the Texas usury laws. As stated in Griffin, the state of the foreign lender has no real interest in applying its usury laws to a Texas debtor, and any attempt by the foreign lender to manipulate the contract terms so that the laws of a state with no interest in the contract will apply is a device to evade the Texas usury laws.[5]
As is noted earlier in this dissent, both the bankruptcy court and the majority misconstrue the meaning of the contrivance “exception” upon which they rely. The “exception”, which disallows the party choice when it is a “contrivance to evade the usury laws” of the forum state, is nothing more than a restatement of the rule itself: The party choice constitutes such a contrivance when 1) the contacts between the selected jurisdiction and the transaction do not establish a “reasonable relation” or 2) when the contacts themselves are contrived in order to validate a party choice of law. Under Section 1.105(a) and Seeman v. Philadelphia Warehouse Company and the principles derived therefrom, see Part II of this opinion, that the present transaction is itself a loan disguised as a sale and leaseback, or that the parties so disguised their *420 transaction or chose the law of Mississippi in order to avoid Texas usury laws, is wholly immaterial so long as the contacts between Mississippi and the transaction are real.
Even if the Griffin case were controlling here (a point I do not concede [6]), it does not require the courts to dishonor the party choice of the lender’s law under all circumstances in which the obligation is sought to be enforced in the borrower’s forum. Griffin does not hold, as the majority suggests, that the state of a foreign lender has no real interest in applying its usury laws to a Texas debtor. The Griffin court expressly found that the lender in that case was not a foreign lender at all, having become domiciled in Texas for the purpose of lending money, and that the only remaining contact between the foreign state and the transaction was itself a contrivance since the parties did not really intend that the contract be performed in the foreign jurisdiction. Building and Loan Ass’n v. Griffin, 90 Tex. at 488, 39 S.W. at 659. Thus, the Griffin court, by virtue of its factual conclusions, was addressing a situation in which the contract stipulated for performance in, and for the application of the law of, a jurisdiction no more closely related to the transaction than was the Republic of China or the Duchy of Luxembourg.
No such contrivance is apparent in the present case. The contacts with Mississippi are real, they have occurred in the normal course of the transaction between these parties, and they are not so tenuous in their nature as to lead to the conclusion that they do not establish a “reasonable relation” between this transaction and the state of Mississippi. In this light, Section 1.105(a) requires that we honor the party choice of law, and I would affirm the district court’s decision to do so.[7]

Conclusion

In the instant case, the differences resulting from the application of Mississippi law rather than Texas law are rather small, being simply whether the Mississippi usury penalties should apply instead of the more rigorous Texas ones. Nevertheless, I believe the damage to law-development that is here done is more than merely theoreti *421 cal. At best, the majority opinion serves to create a snag in the stream of jurisprudence in this circuit that will likely grow more disruptive before it is ultimately cleared away. At worst, it represents a fundamentally erroneous analysis and rationale which will, if followed subsequently, undermine the basic purposes of the UCC to assure a uniform national commercial law governing transactions equally in whatever jurisdiction sought to be enforced. In either event, we will better serve the legislative will of the Texas legislature in its adoption of the Uniform Commercial Code — and the national commercial law sought through its enactment by the legislatures of forty-nine states — by applying rather than ignoring the UCC choice of law provision here applicable.

. Thus, I agree with the majority that the sale-leaseback agreement is correctly characterized as a loan, that parol evidence is admissible to prove the option-to-repurchase (which, under the circumstances, conclusively established that security characterization), and that the loan is usurious. Whether Texas usury law applies (as the majority holds) or instead Mississippi usury law (as the district court held, in my view correctly), these holdings are correctly affirmed. (At the time of the transaction, both Texas and Mississippi provided for interest of ten percent per annum as the maximum legal rate, but Mississippi’s usury penalties were less onerous than are those of Texas.)

. Indeed, if it were no more than that, I should readily join my brothers in furthering the “strong policy of protecting Texas debtors” that the majority sees evidenced in the preUCC jurisprudence of that state. Prior to enactment of the UCC, Texas like most other American jurisdictions viewed with a jaundiced eye attempts by out-of-state money to earn interest beyond the legal rate allowable to borrowers in the forum state and, thus, to “evade” the state’s usury laws. This view, however much it appeals to our Jacksonian economic sympathies, was deliberately repudiated by the UCC (enacted by forty-nine state legislatures) through its adoption of the hotly contested UCC § 1-105(1), discussed in Part II below of this dissent. See, e. g., Nordstrom and Ramerman, The Uniform Commercial Code and the Choice of Law, 1969 Duke L.J. 623 and Pounds, Party Autonomy — Past and Present, 12 So.Tex.L.J. 214 (1970)..

. The majority found the applicable choice of law rule in the nineteenth century case of Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024 (1891). The majority mentions Texas UCC § 1.105(a) only in a footnote, and it is nowhere discussed in the text of the opinion.
In the footnote, the majority apparently relied on a statement in Hi-Fashion Wigs Profit Sharing Trust v. Hamilton Investment Trust, 579 S.W.2d 300 (Tex.Civ.App.— Eastland 1979) to the effect that the Dugan rule was codified in Section 1.105(a). Id. at 302. I do not read that statement in Hi-Fashion as a judicial delimitation of the scope of Section 1.105(a); rather, the statement was merely to the effect that the UCC codification had adopted the Dugan rule that a party choice of the borrower’s law as governing the transaction would be honored, when the borrower’s jurisdiction bore a reasonable relationship to the transaction. It is not authority for any Texas interpretation that the party choice of the lender’s law would not similarly be honored, if the transaction similarly bore a reasonable relation to the lender’s jurisdiction. I find it significant that the Hi-Fashion court went on to resolve the issue before it in terms of the “reasonable relation” test of Section 1.105(a), and on applying that test it honored the party’s choice of Oklahoma law as governing the transaction.
In both Dugan and Hi-Fashion the non-usurious validity of the contract was upheld by the Texas courts by respecting the parties’ reasonable choice of law — a diametrically opposite *416 result to the instant majority- holding, where only by disregarding the parties’ (reasonable, in my opinion) choice of law may the transaction be characterized as unenforceable under the forum law of the borrower.

. Section 1.102 of the Texas enactment provides, identically to the UCC section:
(a) This title shall be liberally construed and applied to promote its underlying purposes and policies.
(b) Underlying purposes and policies of this title are:
(1) to simplify, clarify and modernize the law governing commercial transactions;
(2) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;
(3) to make uniform the law among the various jurisdictions. * * *

. The majority suggests, without so holding, that the choice of law provision here in question was contained in an adhesionary agreement. Neither of the courts below so held, and I do not address that issue except to note that the record does not indicate the courts below erred in this regard.

. The pre-UCC jurisprudence of Texas should not control the present inquiry, because the choice of law considerations in those cases do not take into account the express policies of national commercial uniformity that the legislature of that state subsequently adopted. See note 4, supra. In my view, Texas courts would now be mindful of the policies underlying the statutory choice of law rule embodied in the Texas UCC, and we should not presume otherwise and make an Erie guess that the Texas courts would decide contrary to the statutorily-adopted UCC policies.

. I should like to note that because I believe the majority has applied the wrong choice of law rule in this case I have restricted my dissent to a delineation of what I see as the appropriate application of the correct rule. I have not dwelt long on policy considerations, primarily because the majority’s threshold error in identifying the incorrect choice of law rule led it to decide this case as if the UCC did not exist. Had it not erred in this regard, this case would be a more appropriate forum for weighing the policies embodied in the UCC against those underlying the Texas usury laws. Two points should be made, however.
The majority notes that the expectations of the parties to a multi-state transaction “really mean very little” when that transaction is usurious. To the extent that the only consideration involved is whether or not to allow party expectations to override a state’s usury laws, I might agree. However, both traditional conflicts jurisprudence and UCC § 1-105(1) recognize that in some circumstances the expectations of the parties really mean quite a lot. Where a transaction is usurious in one interested jurisdiction but not in another, then party expectations have traditionally governed. E. g., Seeman v. Philadelphia Warehouse Co., 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123 (1927). This is precisely the circumstance that UCC § 1-105(1) is meant to address, and if the courts indeed take the position that party choice of law provisions are worth very little in usury cases, then a well-entrenched rule of law, embodied in Seeman and codified in UCC § 1-105(1), will be effectively read out of existence, along with our hope for commercial uniformity in this nation. We should not lightly allow this to occur.
The majority also notes that the argument that its decision will make loans less available to Texas borrowers is an argument to the Texas legislature to amend its usury laws. With all due respect, a major point of this dissent is that the Texas legislature has already acted to alleviate this difficulty by adopting its version of the UCC.