## Richmond

## GRAVES CONSTRUCTION COMPANY, INCORPORATED, AND COUNTY SCHOOL BOARD OF ALBEMARLE COUNTY

v.

## ROCKINGHAM NATIONAL BANK

February 29, 1980.

Record No. 780186.

Present: I'Anson, C.J., Carrico, Harrison, Cochran, Poff and Compton, JJ.

*Archibald Wallace, III (M. Pierce Rucker; Albert D. Bugg, Jr.; Sands, Anderson, Marks & Miller, on briefs), for appellants.*

*George H. Roberts, Jr. (Phillip C. Stone; Wharton, Aldhizer & Weaver, on brief), for appellee.*

*Amicus Curiae: Associated General Contractors of Virginia, Inc. (Elizabeth M. Allen; William H. King, Jr.; McGuire, Woods & Battle, on brief), for appellees.*

POFF, J., delivered the opinion of the Court.

Graves Construction Company, Incorporated (Graves), and the School Board of Albemarle County (the Board) appeal from a judgment based upon a ruling that their interests in certain electrical supplies were subordinate to the security interest of Rockingham National Bank (the Bank). Because we believe Graves and the Board took the goods free of the Bank's security interest, we reverse.

The material facts are not in dispute.

In May 1975, the Board contracted with Graves for the construction of a new school. Under a subcontract with Graves, Electrical Contracting Corporation (Electrical) agreed "to furnish all labor [and] materials" for the electrical work. All provisions of the general contract were incorporated by reference in the subcontract.

Approximately a month later, Electrical signed an agreement to secure its "existing and future indebtedness" to the Bank. Electrical had been a regular customer of the Bank for years. The Bank was aware of the nature of Electrical's business and knew that Electrical held the subcontract on the school. The security agreement, a standard

Bank form, granted the Bank a security interest, see definition in Code § 8.1-201(37),[1] in all of Electrical's then-owned and after-acquired assets, including its "inventory, raw materials, work in process and supplies". Electrical was expressly authorized to "sell" such collateral "in the ordinary course of business on terms and at prices customary therein", and the Bank explicitly claimed a security interest in all proceeds. On June 23, 1975, the Bank filed financing statements in the offices of the State Corporation Commission and the clerk of the Circuit Court of Rockingham County.

Electrical began experiencing financial difficulties in 1976 and, at the Bank's request, agreed to have the progress payments made by Graves deposited in an account from which the Bank would make disbursements as needed to pay Electrical's bills. In May 1976, the Bank informed Graves, which was previously unaware of the security agreement, that it had a security interest in Graves' "account payable to Electrical" and that future checks in payment of this account should be sent to the Bank. Graves complied until late November when Electrical quit the job.

By this time, Electrical had defaulted on its obligations to the Bank. As a result, the Bank sought to take possession of certain electrical supplies (wire, connectors, receptacles, lighting fixtures, fuses, switches, clocks, and a "sound system") stored in Electrical's trailers on the construction site and in a large, partly completed school room. Graves had paid Electrical for these goods in accordance with the contracts' requirement that the Board pay Graves, and Graves pay Electrical, 90 percent of Electrical's monthly expenditures for labor and for "materials used in said construction, as well as those stored on the work site." The contracts further provided that "title to all . . . materials . . . whether incorporated in the Project or not, will pass . . . upon the receipt of such payment . . . free and clear of all . . . security interests".

Claiming ownership of the supplies, Graves and the Board prevented the Bank from taking possession. The three parties later agreed that the supplies could be used in completing construction, without prejudice to the Bank's rights. Subsequently, the Bank brought this action in detinue seeking to recover the value of the goods from Graves and the Board (hereinafter, defendants).[2] It was stipulated that the value

---

[1] This and certain other sections of the Uniform Commercial Code, as amended effective July 1, 1974, appear in the 1979 Cumulative Supplement to volume 2A of the Code.

[2] Electrical and its surety also were named defendants. The trial court sustained the surety's demurrer and entered judgment against Electrical, who never responded to the motion for judgment.

of the supplies exceeded the amount of the Bank's claim, which stemmed from a loan made to Electrical when the security agreement was executed and one made in June 1976.

At trial, defendants maintained that the Bank's security interest in the electrical supplies was not perfected; that, even if perfected, it did not survive transfer of the goods to defendants; that the security agreement did not apply to the 1976 loan; that the Bank was estopped to enforce its security interest; and that the Bank was claiming an impermissible lien against public property. Rejecting all these contentions, the trial court entered judgment against defendants for $84,844.37, plus interest and attorney's fees, on November 15, 1977.

■ On appeal, defendants initially contend that the Bank's security interest was not perfected in the manner required by statute.

Code § 8.9-401(1)(b) provides that "when the financing statement is filed as a fixture filing (§ 8.9-313) and the collateral is goods which are or are to become fixtures," the "proper place to file in order to perfect a security interest is . . . in the office where a mortgage on the real estate would be recorded." The Bank admittedly did not file in such office. Asserting that the electrical supplies were goods which were to become fixtures, defendants contend that, under Code § 8.9-301(1)(c),[3] the Bank's interest is subordinate to theirs because, they say, the financing statement was not filed in the proper office. We disagree.

With certain exceptions not relevant here, a filing is essential to the perfection of a security interest. Code § 8.9-302(1). The office where mortgages are recorded is the "proper place to file" only when the filing is a fixture filing. But Code § 8.9-401(1)(b) does not require that the filing be a "fixture filing" just because the goods are to become fixtures. The purpose of a fixture filing is to give the holder of a security interest in fixtures "priority over the conflicting interest of an encumbrancer or owner of the real estate". Code § 8.9-313(4). Until the goods become fixtures, the conflicts addressed by § 8.9-313 do not arise, a fixture filing serves no purpose, and no need to file a financing statement as a fixture filing exists. *See* R. Henson, Secured Transactions 89-90 (2d ed. 1979). Since, at the time the Bank sought to take possession, the electrical supplies had not become fixtures, see the defini-

---

[3] Defendants do not say what status they occupy under § 8.9-301(1)(c). So far as may be pertinent here, that provision protects "a person who is not a secured party and who is a transferee in bulk or other buyer [of goods] not in ordinary course of business, . . . to the extent that he gives value and receives delivery of the collateral without knowledge of the security interest and before it is perfected." Defendants are not transferees in bulk. *See* Code § 8.6-102.

tion in § 8.9-313(1)(a), the Bank's financing statement need not have been filed as a fixture filing. The Bank made a proper filing under § 8.9-401(1)(c), and we conclude that the Bank thus acquired a perfected security interest in the electrical supplies. *See* Code §§ 8.9-303(1),-203(1).

■ However, we do agree with defendants' contention that, by virtue of Code § 8.9-306(2), the Bank's security interest in the electrical supplies did not continue after disposition of the goods to Graves.

Code § 8.9-306(2) states that "[e]xcept where this title otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or oher disposition thereof *unless the disposition was authorized* by the secured party in the security agreement or otherwise". (Emphasis added.) The electrical supplies were goods, § 8.9-105(h); more specifically, they were inventory since they were furnished under a contract of service, § 8.9-109(4). The security agreement authorized Electrical to "sell [inventory] in the ordinary course of business on terms and at prices customary therein". Thus, if Electrical sold the supplies to Graves within the contemplation of the security agreement, the Bank's security interest in those goods terminated.

■ The trial judge ruled that title to the goods passed when Electrical received the progress payments, but that Electrical had not sold inventory in the ordinary course of business because its contract with Graves was a contract for service. The trial court's conclusion places undue emphasis on the nature of that contract. The question is not what type of contract resulted in Electrical's transfer of goods; rather, the inquiry is whether, under the terms of that contract, there was a sale within the contemplation of the security agreement.

Code § 8.2-106(1) states that a " '*sale*' [of goods] consists in the passing of title from the seller to the buyer for a price". With certain exceptions, "title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties." Code § 8.2-401(1).[4] In this case, Electrical and Graves agreed that title to the electrical supplies would pass upon Electrical's receipt of

---

[4] Our application of §§ 8.2-106(1) and -401(1) does not mean that all provisions of Article 2 of the Uniform Commercial Code (Title 8.2 of the Code) apply to this or any other contract for the furnishing of both goods and services. *See generally* 1 R. Anderson, Uniform Commercial Code §§ 2-102:4, 2-102:5 (2d ed. 1970 & Supp. 1979). We observe that, as a matter of common law in Virginia, a sale is the transfer of title for consideration and that, generally, passage of title depends upon the intention of the parties. *Birdsong Co.* v. *Peanut Corp.*, 149 Va. 755, 141 S.E. 759 (1928); *Ellis, Etc., Co.* v. *Hubbard*, 123 Va. 481, 96 S.E. 754 (1918).

payments for the goods. Manifestly, title passed for a price, *viz.*, the amount specified by Electrical as the cost of goods in its applications for payments. Thus, Electrical sold the goods in question to defendants.

As an electrical contractor, Electrical normally supplied the goods it installed. In effect, Electrical was in the business of selling electrical supplies as well as providing services. Given the nature of Electrical's business, which was well known to the Bank, we believe that Electrical's disposition of inventory in conjunction with providing services was exactly the kind of sale authorized by the security agreement.

Relying upon *Elec. Trans. Co.* v. *Penn. Gap Bk.*, 137 Va. 94, 119 S.E. 99 (1923), the Bank argues that title to the supplies could not have been transferred from Electrical until they had been incorporated into the school building. In *Elec. Trans. Co.*, this Court stated that "the materials purchased by [a contractor] for use in a building belong to such contractor until he works them into the structure, or otherwise disposes of them." 137 Va. at 103-04, 119 S.E. at 102. While correct as applied to the facts in that case, the foregoing statement neither addressed nor envisioned a situation where, as here, the contract expresses the parties' intention that title pass at the time the contractor receives payment for the materials. That intention controls.

With little explanatory argument, the Bank also asserts that, notwithstanding the title transfer provisions of the contracts, "as to the Bank title remained vested in Electrical because of the failure of [defendants] to comply properly with the Virginia Recording Acts".

Code § 11-1 states that "except as otherwise provided in § 8.2-402 . . . every . . . contract for the sale of goods . . . when the possession is allowed to remain with the seller, shall be void . . . as to creditors [of the seller]". Such sales may be validated by recordation of the contract as provided in §§ 55-95 and -96.

Clearly, as to the electrical supplies stored in the Board's schoolroom (to which Graves had the only keys), possession was not "allowed to remain with the seller". Some of the supplies were stored in Electrical's trailers. Electrical had free access to these supplies as needed for installation. In that sense, as the Bank says on brief, "Electrical had control over its inventory of materials." But the trailers were parked on the Board's property and, as the Bank acknowledges, "Graves saw to the security of the goods and general job site." Under these circumstances, we believe that, so far as relevant to Code § 11-1 and the cognate recording statutes, possession was not "allowed to remain with" Electrical. The manifest purpose of these statutes is to protect creditors against debtors who give a deceptive appearance of

ownership by retaining possession after title has passed to a stranger to the creditor-debtor relationship. *Cf. Twyne's Case,* 3 Co. Rep. 80b, 76 Eng. Rep. 809 (1601). When, as here, a creditor knows that his debtor is engaged in the construction of a building and is also selling inventory stored on the job site to the owner of the building, the debtor's mere access to the inventory does not constitute the deceptive possession Code § 11-1 addresses. We hold, therefore, that the sales of Electrical's supplies were not void as to the Bank.

■ Finally, the Bank argues that defendants were, in effect, financing Electrical and, in order to gain priority over the Bank's security interest in Electrical's inventory, should have either filed a financing statement before the Bank did, see Code § 8.9-312(5)(a), or "required the Bank to subordinate its interest".[5] It may be true that Graves, as a "buyer", could have arranged its relationship with Electrical so that it could have obtained a security interest in Electrical's inventory. *See* Code § 8.1-201(37). But Graves simply did not go that route. Title 8.9 of the Code applies to transactions "intended to create a security interest in personal property or fixtures". Code § 8.9-102(1)(a). As to the goods in question, the Electrical-Graves contract was not a security agreement, and the transaction was not intended to create a security interest. We conclude that Graves did not have an interest whose protection *required* Graves to file a financing statement. Nor are we persuaded by the Bank's suggestion that defendants could have required it to subordinate its security interest. Subordination agreements are permitted, Code § 8.9-316, not compelled by the law.

We conclude that the Bank's security interest did not continue in the goods after their sale to Graves. Since defendants cannot be held liable in this action unless the Bank's interest is superior, we need not consider additional issues raised by defendants. The judgment for the Bank will be reversed, and final judgment for defendants will be entered here.

*Reversed and final judgment.*

---

[5] To support this claim, the Bank relies on *Chrysler Corporation* v. *Adamatic, Inc.,* 59 Wis.2d 219, 208 N.W.2d 97 (1973). That case is inapposite. There, the court determined that, under the facts before it, Chrysler was not a "buyer in ordinary course of business", within the meaning of §§ 1-201(9) and 9-307(1) of the Uniform Commercial Code. Contrary to the Bank's interpretation, the *Adamatic* court neither held nor implied that a financing buyer cannot benefit from those U.C.C. provisions by which a buyer takes free of a security interest.