In re **FRANK MEADOR LEASING, INC., Debtor.**

**GENERAL MOTORS ACCEPTANCE CORPORATION, Plaintiff,**

v.

**FRANK MEADOR LEASING, INC., Defendant.**

**Bankruptcy No. 7–80–00437.
Adv. No. 7–80–0087.**

United States Bankruptcy Court,
W. D. Virginia,
Roanoke Division.

Nov. 12, 1980.

George I. Vogel, II, Wilson, Hawthorne & Vogel, Roanoke, Va., for plaintiff.

David Furrow, Woodward, Fox & Wooten, Roanoke, Va., for defendant.

## MEMORANDUM OPINION AND ORDER

H. CLYDE PEARSON, Bankruptcy Judge.

### STATEMENT OF CASE

The Defendants, Frank Meador Leasing, Inc. and Frank Meador Buick, Inc. are both before this Court in proceedings under Chapter 11 of the *Bankruptcy Code.* The Plaintiff, General Motors Acceptance Corporation, hereinafter referred to as "GMAC", initially commenced an adversary proceeding by filing a complaint against Frank Meador Leasing, Inc., hereinafter referred to as "Leasing", alleging a security interest in a certain 1980 Buick Electra Ltd. automobile seeking recovery of the automobile or payment in full for same. "Leasing" filed an answer and when the matter came on for hearing on June 23, 1980, it appeared that necessary parties defendant should be added. Upon motion of the Plaintiff, this Court entered an Order on July 17, 1980, permitting the Plaintiff to file an amended complaint adding as parties defendant, Boyd A. Isley, Jr., hereinafter referred to as "Isley", Colonial–American National Bank, hereinafter referred to as "Bank", and Frank Meador Buick, Inc., hereinafter referred to as "Buick". The amended complaint was filed and service was made upon the Defendants "Buick", "Isley" and

"Bank", pursuant to *Bankruptcy Rule* No. 704. Thereafter evidence was heard, memorandums of authorities filed by Counsel and the matter is now before the Court for decision.

### STATEMENT OF FACTS

The Plaintiff "GMAC" provided wholesale floor–plan inventory financing for the Defendant, "Buick", a General Motors Buick dealer in Roanoke, Virginia, pursuant to a wholesale security agreement executed by "Buick", dated June 15, 1977. Financing statements were executed and filed on June 16, 1977 in the Clerk's Office of the Circuit Court for the City of Roanoke, Virginia, and on June 17, 1977 with the Clerk of the State Corporation Commission for the Commonwealth of Virginia in compliance with applicable provisions of the Uniform Commercial Code of Virginia.

Pursuant to its wholesale security agreement, on or about April 1, 1980 "GMAC" paid to Buick Motor Division Manufacturing branch of General Motors, the sum of $9,420.78 for the delivery of the ordered 1980 diesel Buick Electra Ltd. 4–door Sedan to "Buick". The automobile was delivered to "Buick" by Buick Motor Division and on April 14, 1980 "Buick" sold the automobile to "Leasing". The bill of sale recited a price of $12,302.20 reduced by a fleet discount price of $1,981.42 for a total net purchase price of $10,320.78. Also on the same day, April 14, 1980 "Leasing" delivered to the ultimate lessee "Isley", pursuant to a lease agreement entered into between "Leasing" as Lessor and "Isley" as Lessee.

Further, on April 14, 1980 by an appropriate instrument designated "assignment of lease",[1] "Leasing" assigned its rights under the "Isley" lease along with a security interest in the vehicle itself, to "Bank" to secure the payment of a note in the amount of $13,428.92, said note including interest is payable in thirty–six (36) monthly installments of $292.47 each beginning May 14,

---

1. Paragraph first (unnumbered) of the "assignment of lease" states that "Leasing" "sells and assigns the lease" .... to "Bank" and unnumbered Paragraph two states that "Leasing" "further assigns to the 'Bank' and grants it a security interest in the property subject to the lease..."

1980 with a final balloon payment at the end of the thirty–six (36) month period in the amount of $2,900.00. The note recited an amount of $10,320.71 as proceeds and $3,108.21 as interest.

On that same day, April 14, 1980, "Leasing" paid "Buick" in the ordinary course of business $10,320.78 by check of even date, on the account of "Leasing" signed by Frank B. Meador, Jr., President of both "Leasing" and "Buick", payable to "Buick".

Counsel for GMAC and Debtors have stipulated and agreed that Frank Meador, Jr. was chief officer of and was involved in the day to day management of both "Buick" and "Leasing". The funds were disbursed from "Leasing" to "Buick" with Meador's knowledge and direction and, thereafter used to pay "Buick's" operating expense and other creditors due to cash flow difficulties.

The terms of the wholesale security agreement previously mentioned provided as follows:

"We (Buick) understand that we may sell and lease the vehicles at retail in the ordinary course of business."

The language of the wholesale security agreement states further:

"We further agree that as each vehicle is sold or leased, we will, faithfully and promptly remit to you the amount you advanced or have become obligated to advance on our behalf to the manufacturer, distributor or seller, with interest at the designated rate per annum then in effect under the GMAC wholesale plan."

The requirement that "Buick" remit funds to "GMAC", contrary to "GMAC's" contention, is not a condition of sale. Testimony adduced ore tenus indicates that it was the custom of the trade that "Buick" make payment to "GMAC" following a sale of vehicles from inventory.

On or about April 10, 1980, Agents of "GMAC" audited the inventory of "Buick". At that time they found that the 1980 diesel Buick Electra was missing from the inventory and that they, "GMAC", had not received payment for the automobile. The next day, April 11, 1980, "GMAC" recovered from "Buick" the certificate of origin for the automobile in question. "GMAC" still holds the certificate of origin for the vehicle and acknowledges that a certificate of title has never been issued for it.

Presently, "Isley", the Lessee has possession of the automobile pursuant to the lease agreement with "Leasing". "Bank" has taken the assignment of lease. The terms of the lease provide that "Isley" shall lease the automobile for a period of thirty–six (36) months at a monthly rental of $310.00. The agreement further provides that if at the end of the lease period "Leasing" is not able to realize a net amount of $3,000.00 from a wholesale sale of the automobile, "Isley" will be required to pay in addition to his regular monthly lease payments, the difference between the net amount realized from the wholesale sale and $3,000.00. He also has the right to capture the vehicle if he decides to exercise his option rights.

The Defendant, "Leasing's" position is that upon assignment of the lease to "Bank", "Leasing" paid the full amount owed for the automobile over to "Buick". "Leasing" and "Buick" are two distinct corporations and are engaged in two distinct and different purposes. Frank B. Meador, Jr., who is the chief executive officer of both corporations is also the sole stockholder of each. Mr. Isley, the Lessee and current possessor of the automobile indicated that he had leased automobiles from "Leasing" before and he in fact had planned for several months to lease the automobile in question. "Buick" and "Leasing" each have separate creditors.

In so far as "Isley" and the "Bank" are concerned, the transaction between "GMAC", "Leasing" and "Buick" were in the normal course of business without any notice to "Isley" or the "Bank" of any failure to remit by "Buick" to "GMAC" or other transactions involving "GMAC", "Leasing" or "Buick" concerning this specific vehicle under their contract arrangements.

Since the Debtor "Buick" and "Leasing" filed petitions in this Court on April 23, 1980, there is no evidence that the "Bank" had reason to believe the transaction was

otherwise than in the normal, or ordinary course of business.

## CONCLUSIONS OF LAW

The issue presented for the Court's determination is whether the sale of the automobile from "Buick" to "Leasing" was authorized pursuant to the wholesale security agreement and, if it was, whether applicable law dictates a termination of "GMAC's" security interest in the Buick automobile.

As previously mentioned, the Wholesale Security Agreement between "Buick" and "GMAC" provides: "We understand that we may sell and lease the vehicles at retail in the ordinary course of business." This simple language makes it abundantly clear that as is the custom in the automobile industry, the auto dealer is to sell the floor–planned automobiles as soon as possible in the ordinary course of business. This language represents an express agreement between the parties authorizing "Buick" to sell vehicles floor–planned by "GMAC". It was "GMAC's" own wholesale security agreement form which was used by the parties.

The fact that "Buick" sold the vehicle to "Leasing" at a discount is not in and of itself sufficient to change such sale to one not in the usual or ordinary course of business. Discounts are granted many persons who insist upon same before buying a new or used vehicle. In this respect, neither "Isley" or the "Bank" is charged with the duty of inquiry as to terms of agreement between "Buick" and "Leasing". *See Anderson, infra.*

In support of its contention that "Buick" was authorized to sell the automobile in issue to "Leasing", "Buick" urges this Court to consider *Va. Code Ann.* § 8.9–306(2) which provides in pertinent part:

"Except where this title otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof *unless the disposition was authorized by the secured party in the security agreement or otherwise,* and also continues in any identifiable proceeds including collections received by the debtor." (emphasis added)

It is clear from the code language cited that if the disposition of the collateral was authorized by the secured party in the security agreement or by some other means ("or otherwise"), the original security interest fails. Professor Anderson puts it another way:

Otherwise stated, it is not necessary that the buyer be a 'buyer in the ordinary course' in order to come within the operation and protection of Code § 9–306, for unlike [other provisions] . . . a sale under § 9–306 destroys the interest of the secured party not because of the meritorious character of the buyer but because the secured party has agreed that a buyer may acquire rights by resale. 4 *Anderson* 311, § 9–306:18 (2d ed. 1971).

In *Rome Bank & Trust Co. v. Bradshaw*, 143 Ga.App. 152, 237 S.E.2d 612 (1977) the Bank as floor–plan inventory financier had brought action against a used–car dealer and individual defendants who were purchasers of used cars from the dealer seeking to foreclose on the vehicles and obtain possession of them, claiming the dealer had sold them outside of the ordinary course of business without authorization. The Georgia court cited GSA § 109A–1–201(9) as controlling law:

A buyer in the ordinary course of business . . . takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

The court went on to quote with approval from 4 *R. Anderson* 318 § 9.307:1(2) Official Code Comment:

The limitations which this Section [§ 1–201(9)] imposes on the persons who may take free of a security interest apply of course only to unauthorized sales by the debtor. If the secured party has authorized the sale in the security agreement or otherwise, the buyer takes free without regard to the limitations of this Section.

██ As in *Rome Bank and Trust,* in the case *sub judice* there is nothing contained in the original floor–plan arrangement which would indicate that the sales of

the vehicles in these cases were unauthorized. However, even if the sale of automobiles was unauthorized the buyers in the ordinary course of business would take free of any lien created by the floor–plan arrangement. The reasoning is simple: even if the language of the security agreement between the floor–plan financier and the dealer is absent or unclear, it is customary that when inventory is delivered to a dealer–debtor, the secured party gives an implied if not an express authorization that the collateral is to be sold. It is axiomatic that when a sale is made, the secured party surrenders its claim in the inventory to the one who makes the purchase from the dealer in the ordinary course of business. *See* 4 *Anderson* 312, § 9–306:18 citing *Mathews v. Arctic Tire, Inc.*, 262 A.2d 831 (RI).

Not only is this Court constrained to look to this particular sale between "Buick" and "Leasing", but it may also consider evidence of the past course of dealing between "GMAC", "Buick", and "Leasing". Testimony at trial indicated numerous other similar transactions involving these three parties. If the issue has become the authority of the dealer to resell without the consent of the floor–plan financier, it may be shown that there existed a prior course of dealing between the creditor and the debtor, with the debtor selling the collateral and then paying the amount to the creditor which would credit such payment to the account of the debtor. *See* 4 *Anderson Supp.* 107, § 9–306:18 (Supp.ed. 1979) citing *Hedrick Savings Bank v. Meyers*, 229 N.W.2d 252 (Iowa). In short, "GMAC" is on notice of these transactions and should not now be heard to complain that it did not confer authorization on "Buick" on this occasion when it had allowed many other similar transactions without a single objection. There was no evidence offered by "GMAC" to distinguish this transaction from any of the prior fifty.

The sort of transactions involved herein is not uncommon among the types of businesses involved. Generally, with this type of inventory financing, the lien of the wholesale financier is automatically extinguished upon sale. This is under *Va. Code Ann.* § 8.9–307 which provides that "A buyer in the ordinary course of business [as defined in *Va. Code Ann.* § 8.1–201(9)] ... takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence." The definitional section of the U.C.C., § 8.1–201(9) provides:

> " 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind."

There is neither allegation nor proof of any activity between "Buick" and "Leasing" which is anything less than above–board. There is no indication of any lack of good faith; all we have here is a sale of an automobile from one company to another, even though the companies are owned by the same person.

In a Kentucky case, the court was presented with a similar set of facts. In that case, *Universal C. I. T. Credit Corp. v. Middlesboro Motor Sales, Inc.*, 424 S.W.2d 409 (Ky. 1968), the court was asked to determine the priority of liens between two banks and U.C.I.T. U.C.I.T. was the floor–plan financier for the dealer and the banks financed the purchase of the automobiles in question from the dealer, *Middlesboro*. Citing KRS 355.9–306(2) [which appears identical to *Va. Code Ann.* § 8.9–306(2)] the court held that U.C.I.T.'s lien ended automatically upon the sale of the automobiles to a purchaser in the ordinary course of business. It appeared that U.C.I.T. had a prior perfected security interest in the inventory of the car dealership. Importantly, as required by § 9–306(2) the court looked to the language of the security agreement between U.C.I.T. and Middlesboro; "[Middlesboro] shall have liberty to exhibit and to sell each chattel in the ordinary course of trade." U.C.I.T. had thus expressly authorized the sale of the automobiles in the ordinary course of business and the court correctly concluded that the banks had the prior, and in fact the only, interest in the automobiles.

*In accord* is the recent Virginia Supreme Court decision of *Graves Construction Company, Inc. v. Rockingham National Bank,* —— Va. ——, 263 S.E.2d 408 (1980). There the court held, *inter alia,* that a creditor's security interest in the supplies did not continue after disposition of the supplies to the general contractor where the security agreement authorized the electrical contractor to sell inventory in the ordinary course of business. As in the instant case, the resolution of the issue turned on the terms of the contract or wholesale security agreement. In each case, because the contract expressly authorized the sales in the ordinary course of business, the former security holders do not have priority over the later–acquired security interest, here by the Bank.

In *Graves* and *Universal C.I.T., supra,* the courts alluded to the terms of the security agreement in each case. This may appear appropriate to so do. However, *Va. Code* 8.1–201(9) *supra,* appears to make this search unnecessary if the Court finds, as here, that the sale was in "the ordinary course of business". Once this is determined, then the specific terms of agreements, floor–planning or otherwise where inventory is concerned, are an undue burden upon commercial transactions. The Uniform Commercial Code was designed to eliminate these pitfalls rather than create them as the Uniform Commercial Code Commentators stated at *Va. Code Ann.* § 8.1–102 (1965 Add. Vol.):

"(1) This act shall be liberally construed and applied to promote its underlying purposes and policies.

(2) Underlying purposes and policies of this act are

(a) to simplify, clarify and modernize the law governing commercial transactions;"

Accordingly, it is the conclusion of the Court that the prayer of the complaint should be denied, and the lien rights of "GMAC" voided, and it is so ORDERED.

Service of a copy of this Memorandum Opinion and Order is being made by mail to the Debtor; David Furrow, Esq., Counsel for Debtor; and George I. Vogel, II, Esq., Counsel for the Plaintiff.